# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| WEBSEED, INC., and BRIGHTEON MEDIA, INC., | CIVIL ACTION No. 24-cv-576 |
| *Plaintiffs,* | |
| vs. | **COMPLAINT** |
| DEPARTMENT OF STATE, GLOBAL ENGAGEMENT CENTER, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, NEWSGUARD TECHNOLOGIES, INC., INSTITUTE FOR STRATEGIC DIALOGUE, GLOBAL DISINFORMATION INDEX, META PLATFORMS, INC. (f/k/a/ FACEBOOK, INC.), GOOGLE, LLC, X CORP. (f/k/a/ TWITTER, INC.), JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, and JOHN DOE 10. | |
| *Defendants.* | |

Plaintiffs, Webseed, Inc. ("Webseed"),[1] and Brighteon Media, Inc. ("Brighteon"),[2] (collectively, "Plaintiffs"), by and through undersigned counsel, hereby sue Defendants, the Department of State ("DOS"),[3] the DOS' Global Engagement Center ("GEC"), the Department of

---

[1] Webseed, Inc., manages naturalnews.com, as just one of many examples of brands / brand names under the Webseed corporate umbrella. All brands / brand names associated with Webseed, Inc., which such brands / brand names are necessarily also implicated by this lawsuit, are set forth on **Exhibit A** attached hereto and incorporated fully herein by reference.

[2] Brighteon Media, Inc., manages brighteon.com, as just one of many examples of brands / brand names under the Brighteon corporate umbrella. All brands / brand names associated with Brighteon Media, Inc., which such brands / brand names are necessarily also implicated by this lawsuit, are set forth on **Exhibit B** attached hereto and incorporate fully herein by reference.

[3] Plaintiffs reserve the right to amend this Complaint to name as Defendants various leaders (in their official capacities) of the myriad Government departments at play here, depending on what discovery might show as to individual involvement with / responsibility for the wrongdoing complained of herein. For example, discovery may show that DOS head (Secretary of State) Antony Blinken deserves to be named as a Defendant in his official capacity. As other examples, the various leaders of the Global Engagement Center (*e.g.*, Deputy Coordinator Leah Bray, Coordinator James P. Rubin, Principal Deputy Coordinator Daniel Kimmage, Senior Technical Advisor Alexis Frisbie, Director of the Technology Engagement Team Patricia Watts). As another example, Department of Defense head (Secretary of Defense) Lloyd J. Austin, III. As another example, Department of Homeland Security head (Secretary of Homeland Security) Alejandro Mayorkas.

Defense ("DOD"), the Department of Homeland Security ("DHS"),[4] NewsGuard Technologies, Inc. ("NewsGuard Tech"), Institute for Strategic Dialogue ("ISD"), Global Disinformation Index ("GDI"),[5] Meta Platforms, Inc. ("Meta," f/k/a/ Facebook, Inc., "Facebook"), Google, LLC ("Google"), X Corp. ("X," f/k/a/ Twitter, Inc., "Twitter"),[6] John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, and John Doe 10, (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This lawsuit is multi-faceted regarding the interrelationships between the various actors / wrongdoers / Defendants and the acts / wrongs flowing from those relationships. That said, however, there is a common denominator to all the wrongs committed by Defendants and complained of herein … an anti-competitive animus.

2.      As to Government's anti-competitive animus, for example, this lawsuit addresses Government's aim to eradicate (by way of the Government's Tools, *see* n. 5, *supra*, implemented by the Government's Instruments, *see* n. 6, *supra*) Plaintiffs from social media platform spaces (*e.g.*, Facebook, Google, Twitter) relating to the dissemination of, for example, COVID information, which such social media space the Government and Plaintiffs compete over in the COVID vein. Put differently, part of this lawsuit involves Government's voracious appetite to silence competitive COVID-related speech involving viewpoints that do not square with those of the Government, which include Plaintiffs' viewpoints on COVID in general, COVID treatment, and / or COVID avoidance. Indeed, "the Government was the primary source of misinformation

---

[4] Hereafter, DOS, GEC, DOD, and DHS are collectively referred to as the "Government."

[5] Hereafter, NewsGuard Tech, ISD, and GDI are collectively referred to as the "Government's Tools" / "Tools."

[6] Hereafter, Facebook, Google, and Twitter are collectively referred to as "Big Tech" or the "Government's Instruments" / "Instruments."

during the pandemic, and the Government censored dissidents [Plaintiffs] and critics [Plaintiffs] to hide that fact." ~ Stanford U. Professor J. Bhattacharya (speech with the MIT Free Speech Alliance).[7]

3.      As to the Government's Instruments' anti-competitive animus, for example, this lawsuit also addresses Big Tech's anti-competitive animus towards Plaintiffs concerning social media space (*e.g.*, Facebook, Google, and Twitter platforms) in general, which such space is of substantial revenue generating potential (*e.g.*, advertising monies and web trafficking monies, derived from the dissemination of information) and which such space Plaintiffs and Facebook (for example) compete over. Put differently, part of this lawsuit involves Big Tech's insatiable, monopolistic greed to augment corporate profit in anti-competitive fashion. This, as discussed below, not only serves Big Tech in fulfilling the Government's coerced censorship objectives, but also in fulfilling Big Tech's monopolistic money-making objectives.

4.      Social media and other digital platforms are widely considered, at least by the public, to be the digital version of the modern "public square."[8] But the modern public square that is social media and other digital platforms has become anything but an open gathering place for public opinion to be freely expressed as falsely promised by social media / digital platform leaders (*e.g.*, Facebook, Google, Twitter).

5.      Over approximately the last year, through the release of the internal communications at Twitter (the "Twitter Files"), the preliminary discovery in *Missouri v. Biden*,

---

[7] Not so surprisingly, according to a December 2022 release of the Twitter Files, Professor Bhattacharya (a critic of various COVID-19 responses / approaches, and a proponent of approaches such as herd immunity) was placed on a Twitter "trends blacklist" in August 2021 that prevented his tweets from populating in searches of trending topics. "Not so surprisingly" because Professor Bhattacharya's COVID-19 viewpoints contradicted those of the Government and, so, the Government's Instruments (*e.g.*, Twitter) were obliged to censor Professor Bhattacharya at the Government's behest.

[8] https://www.merriam-webster.com/dictionary/public%20square (defining "public square" as "the sphere of public opinion" and / or "an open public area … where people gather").

the House of Representatives' release of the "Facebook Files," and ongoing responses to FOIA requests, for examples, Americans have learned that the Government has affirmatively coerced social media platforms (*e.g.*, Facebook, Google, Twitter) to censor lawful and legitimate (but disfavored) information of their own users (*e.g.*, Plaintiffs) by way of, for example, "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" data manufactured by the Government-funded Tools. That is, the Government has not only coerced (*via* exertion of extreme pressure and threat) Big Tech into the Government's desired censorship campaign (*i.e.*, overt molding / manipulation of the modern public square), but the Government has also equipped Big Tech with the maligning / discriminatory Tools-based information (*e.g.*, NewsGuard "blacklist") by which to carry out such heavy-handed censorship.

6.     Here, the Government's animus toward / motivation for stripping Plaintiffs (a large digital news-media presence) of their voices and economic well-being (through Government-coerced Big Tech facilitated censorship "supported" by Government-funded "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" smear data hoked up by the Government's Tools) was / is that the Plaintiffs and the Government were / are news-media competitors (to Government and its partners) in the space of healthcare and life sciences who did / do not share the same views on a number of related topics / issues.

7.     Here, one of the hot topics / issues (although not the only topic / issue) over which Plaintiffs and the Government did / do not share similar views and over which Plaintiffs and the Government were / are in competition for social media platform space was / is COVID. And, here, the Government does not want to concede social media space to anybody (Plaintiffs) who holds differing viewpoints on COVID because the public may well choose to get COVID information

4

from Plaintiffs instead of the Government and choose to make COVID-related decisions based on Plaintiffs' information rather than the Government's information.

8.     Because Plaintiffs present a competitive threat to the Government in relation to COVID, Plaintiffs were / are disfavored by the Government (*i.e.*, sources of "misinformation" / sources of "disinformation" / "risky" / "untrustworthy" / "unreliable" per the Government-funded Tools) and were / are accordingly due to be eliminated from the modern public square that is social media vis-à-vis Government-coerced Big Tech censorship "substantiated" by Government-funded Tools.

9.     In 1994, the principal of Plaintiffs immigrated to the United States from Taiwan and started her own company. For the next ten years, as a woman- and minority-owned business, Plaintiffs' principal fulfilled the American dream by working 16-hour-plus days and helped United States companies (*e.g.*, Intel, Starbucks, Nike, HP, IBM, Microsoft) enter the Asia market.  For example, Plaintiffs' principal's team translated Microsoft's first spell checker for Microsoft Word in Mandarin Chinese for its Taiwan market.

10.    In 1994, Plaintiffs' principal (along with her business partner – her husband) formed an email marketing software company to help marketers communicate with their audience.

11.    Plaintiffs' principal is a proud American, particularly proud of the freedom to create success and express creativity through hard work and dedication in America. Plaintiffs' principal is acutely aware of what a world without the freedoms guaranteed by our Constitution looks / feels like because, among other things, her grandfather escaped from communist China in 1945. This family experience and lineage taught Plaintiffs' principal how valuable freedom of expression is for democracy.

12.    For the next twenty years, Plaintiffs' principal (along with her business partner / husband) established a large online presence and built popular freedom-related infrastructure with sites such as NaturalNews.com, NewsTarget.com, and Brighteon.com. *See* nn. 1-2, *supra*.

13.    Plaintiffs discussed human rights issues, as well as ways to optimize health for their English-speaking audience.

14.    Plaintiffs have reached millions of readers since the year 2000, and, because of Plaintiffs' brave discussions about tough issues (*e.g.*, illegal organ harvesting with Fa Lun Gong in China), the NaturalNews.com site was banned in China in 2014.

15.    In 2015, Plaintiffs were quite vocal about supporting Donald Trump's presidency, and as a strong supporter of President Trump (and his pro-security, pro-energy vision for America), Plaintiffs started noticing that their search engine results were being artificially and deceptively reduced (*i.e.*, shadow-banned) by Google, for example. Fast forwarding, Google delisted the NaturalNews.com site (consisting of 140,000 web pages) … memory wiped and gone overnight. Fast forwarding further, Google also suspended Plaintiffs' merchant account. After all of that, Google search shadow-banned nearly all NaturalNews.com-related content. And, finally, Google removed the NaturalNews app from Google Play. Disconcertingly, Google's conduct was / is not much different than that of China, *see* ¶ 14, *supra*, where freedoms such as speech do not exist.

16.    Similarly, Facebook blocked Natural News' distribution to over 99% of its followers (2.5 million followers). Fast forwarding, Facebook would end up deleting / wiping out Natural News entirely, which harms not only Plaintiffs but also the 2.5 million followers who solicit Plaintiffs' natural health related information. In addition to NaturalNews.com, Facebook will not allow anyone else to share links from Plaintiffs' Brighteon.com site. This is sometimes

called domain blocking. Facebook's conduct was / is little different than that of China, *see* ¶ 14,
*supra*, where freedoms such as speech do not exist.

17.     All told, the wrongs outlined above are conservatively expressed; *i.e.*, not
exhaustive.

18.     Moreover, Plaintiffs' conservatively estimate that the wrongs outlined throughout
this Complaint (above and below) caused Plaintiffs' businesses $25,000,000.00 – $50,000,000.00
in lost revenue to date. "To date" because this is just revenue that has already been lost … more
and more revenue and business opportunities are lost as each day passes.

19.     Moreover, Plaintiffs have suffered great reputational damages. At present,
monetary quantification of such damages is a virtual impossibility.

20.     America is plagued by the Defendants foul play that is the subject of this litigation.
Those who speak out get punished, and entrepreneurs are punished and made examples of when
trying to do good deeds and / or better themselves (in the livelihood sense) in accordance with the
American Dream. Plaintiffs' online presence was / is artificially restricted and knocked down so
that Plaintiffs cannot grow, with the eventual aim of Defendants being complete eradication of
Plaintiffs from the modern-day public square that is social media, simply because Plaintiffs were
bold enough to speak up on "controversial" life issues. Plaintiffs cannot imagine an America that
continues to deprive constitutional rights. Plaintiffs are incredibly committed to this endeavor, in
particularly in the freedom of speech / press vein.

21.     Defendants' unlawful, inequitable, and unconstitutional conduct (the Tools'
mischaracterizations of Plaintiffs and Big Tech's related censorship / blackballing of Plaintiffs, all
at the coercive behest and funding of the Government in whole or in part) has resulted in Plaintiffs
experiencing (and continuing to experience to this day and doubtless moving forward) the

following, for examples: (a) reputational damage; (b) reduced growth; (c) lost business opportunities / prospective economic advantage; (d) substantial monetary harm (*e.g.*, reduced advertising / web trafficking revenue); (e) loss of voice / speech within Plaintiffs' marketplaces (*e.g.,* news-media and holistic healthcare) or otherwise; and (f) *et cetera*.

22.     This lawsuit seeks both monetary and non-monetary relief for the wrongs (illegalities, inequities, and unconstitutionalities) perpetrated against Plaintiffs by Defendants. As to monetary redress, the amount in controversy (exclusive of attorneys' fees, costs, and interest) well exceeds $75,000.00. To be clear, monetary relief is sought from the private / commercial Defendants who are the closest proximate causes of the subject censorship-related harms (NewsGuard, ISD, GDI, Facebook, Google, Twitter) and the non-monetary relief (injunction) is sought from all contributory Defendants (including the Government).

## PARTIES, JURISDICTION, AND VENUE

23.     At all material times, Webseed, Inc., was / is a company incorporated in Wyoming, with its principal place of business / nerve center / headquarters in Bastrop County, Texas.[9]

24.     At all material times, Brighteon Media, Inc., was / is a company incorporated in Wyoming with its principal place of business / nerve center / headquarters in Bastrop County, Texas.[10]

25.     At all material times, the DOS was / is an executive agency of the United States of America ("USA"). At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

---

[9] All brands / brand names associated with Webseed, Inc., are necessarily also implicated by this lawsuit. *See* n. 1, *supra*, and Exhibit A.

[10] All brands / brand names associated with Brighteon Media, Inc., are necessarily also implicated by this lawsuit. *See* n. 2, *supra*, and Exhibit B.

26. At all material times, the GEC was / is an interagency center housed in, and funded by, the DOS. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

27. At all material times, the DOD was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

28. At all material times, the DHS was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

29. At all material times, NewsGuard Tech was / is a company incorporated in Delaware, with its principal place of business / nerve center / headquarters in Manhattan County, New York.

30. At all material times, ISD was a private limited company with its citizenship (*i.e.*, principal place of business / "nerve center") in the United Kingdom (London, England). ISD was incorporated on April 30, 2008. ISD's eight active officers / members consist of the following: (a) Mark S. Bergman, role = director, occupation = attorney, residence = England, nationality = American; (b) Sir Michael L. Davis, role = director, occupation = businessman, residence = England, nationality = British; (c) Stuart C. Fiertz, role = director, occupation = banker, residence = United Kingdom, nationality = American; (d) Dr. Serra Kirdar, role = director, occupation = academic, residence = United Kingdom, nationality = British; (e) Michael Lewis, role = director, occupation = Director Oceana Investment, residence = England, nationality = British; (f) Konstantin Von Unger, role = director, occupation = investor, residence = England, nationality = German; (g) Edward J. Williams, role = director, occupation = director, residence = England,

nationality = British; and (h) Stephen Zinser, role = director, occupation = CEO, residence = England, nationality = American.[11]

31.     At all material times, GDI was / is a private limited company with its citizenship (*i.e.*, principal place of business / "nerve center") in the United Kingdom (Sutton Coldfield, England). GDI was incorporated as Disinformation Index, LTD, on April 7, 2018. GDI's two active officers / members consist of the following: (a) Clare A. Melford, role = director, occupation = business consultant, residence = United Kingdom, nationality = British; and (b) Danny Rogers, role = director, occupation = entrepreneur, residence = USA, nationality = American.

32.     At all material times, Facebook was / is a company incorporated in Delaware, with its principal place of business / nerve center / headquarters in San Mateo County, California.

33.     At all material times, Google was / is a Delaware limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Santa Clara County, California. Google's members / authorized persons consist of Sundar Pichai (CEO), Ruth Porat (CFO), Kent Walker (Secretary), Kenneth Yi (Assistant Secretary), and XXVI Holdings, Inc. (Authorized Member), all of whom, in corporate filings, set forth Mountain View, California (Santa Clara County) with respect to domicile / residence.

34.     At some material times, Twitter was a company incorporated in Delaware, with its principal place of business / nerve center / headquarters in San Francisco County, California. At other material times, X was / is a company incorporated in Nevada, with its principal place of business / nerve center / headquarters in San Francisco County, California.

35.     John Does 1-10 are presently fictious Defendants "named" as parties to this action

---

[11] In anticipation of service on foreign entities (ISD and GDI), undersigned counsel / Plaintiffs retained a specialist regarding same – Aaron Lukken, Esq.

based on the likelihood that other third parties (*e.g.*, YouTube, Global Internet Forum to Counter Terrorism / Global Network on Extremism and Technology, *et cetera*) are also responsible for the wrongs set forth in this Complaint. Of course, following a reasonable period for discovery (*i.e.*, after the identity of other wrongdoers is learned), Plaintiffs reserve the right to amend this Complaint to set forth the true names of the present John Doe Defendants.

36.     This Court possesses jurisdiction pursuant to Title 28, United States Code, Section 1332. The parties are completely diverse (*i.e.*, there are no Texans in Defendants' camp), and the amount in controversy exceeds $75,000.00 exclusive of fees, costs, interest, or otherwise. Moreover, because the Constitution (First Amendment) is implicated by this case, the Court also possesses federal question jurisdiction pursuant to Title 28, United State Code, Section 1331.

37.     Venue is proper in the Western District Court of Texas pursuant to Title 28, United States Code, Section 1391(b), since this judicial district is where Plaintiffs maintain their principal place of business and since various events or omissions which give rise to and / or underlie this suit occurred within this judicial district. And the Austin Division of this Court has personal jurisdiction due to Defendants' minimum contacts in this forum.

## COMMON ALLEGATIONS

### *The Overall, Concerted Defendants Scheme*

38.     The Government concertedly, coercively, collusively, conspiratorially engaged in an illegal, inequitable, and unconstitutional scheme of developing, promoting, and / or endorsing "tools" aimed at bolstering social media providers' (*e.g.*, Facebook / Meta, *et cetera*, "Big Tech") censorship-oriented suppression of social media users, such as Plaintiffs. Put differently, Big Tech served (and continues to serve) as the Government's instrumentality in wielding Government-induced censorship "tools" (*e.g.*, NewsGuard Tech, ISD, GDI) against social media users, such as

Plaintiffs.

39.    More specifically, the DOS (through, for example, its GEC and other partners such as NewsGuard Tech) and the DOD actively intervene in the news-media market to illegally, inequitably, and / or unconstitutionally quash the profitability of outlets within the news-media market that Government disfavors; *e.g.*, Plaintiffs. Said differently, in order to suppress the "free" speech of a disfavored segment of the American press (*e.g.,* Webseed, Brighteon, Daily Wire, Federalist, and *et cetera*) and thereby strongarm such segment out of the entirely speech-dependent news-media market,[12] the Government (a) funds the infrastructure, development, marketing, and promotion of private censorship enterprises and their associated censorship technology / "tools" (*e.g.*, NewsGuard Tech, an enterprise offering the NewsGuard "tool," as well as ISD and GDI) and, then, (b) wields such "tools," in whole or in part, against the aforementioned disfavored segment vis-à-vis Big Tech (*e.g.*, Facebook) platform censorship.

40.    NewsGuard "is a rating system for news and information websites [*e.g.*, Big Tech]. It is accessible *via* browser extensions and mobile apps. NewsGuard Technologies Inc., the company behind the tool, also provides services such as misinformation tracking and brand safety for advertisers, search engines, social media platforms, cybersecurity firms, and government agencies."[13]

41.    ISD (a foreign entity enlisted to aid in the censorship of domestic speech) describes itself, in pertinent part, as follows:

> Since 2006, ISD has been at the forefront of analysing and responding to extremism in all its forms. Our global team of researchers, digital analysts, policy experts, frontline practitioners, technologists and activists have kept ISD's work

---

[12] Daily Wire and Federalist were selected as other examples not only because they are entities somewhat similar in nature to Plaintiffs but also because they are involved in a somewhat similar lawsuit in the United States District Court Eastern District of Texas (Tyler Division).

[13] https://en.wikipedia.org/wiki/NewsGuard.

systematically ahead of the curve on this fast-evolving set of threats. We have innovated and scaled sector-leading policy and operational programmes – on- and offline – to push back the forces threatening democracy and cohesion around the world today.

*** 

ISD partners with governments, cities, businesses and communities, working to deliver solutions at all levels of society, to empower those that can really impact change. We are headquartered in London with a <u>global footprint</u> that includes teams in Washington DC …

*** 

We design and deliver programmes that empower cities, practitioners and civil society around the world to mitigate hate, polarisation and disinformation. …

*** 

We formulate and advocate policy solutions, and provide local authorities, central governments and multilateral institutions with the data, expertise and technical support to deliver evidence-based *policy and programming*. ISD has provided policy support and training to over 40 governments and hundreds of cities worldwide. …

*** 

Beyond partnerships with institutions like the Global Counter-Terrorism Forum, ISD has spearheaded and led inter-governmental initiatives in the domains of counter-extremism and digital regulation. ISD's Digital Policy Lab brings 12 governments, the European Commission and regulators together to chart the path forward on platform governance … [14]

42.     As for GDI (a foreign entity enlisted to aid in the censorship of domestic speech), the first words on its homepage are "[w]e exist to disrupt online disinformation."[15] GDI's homepage goes on to further describe itself, in pertinent part, as follows: "We aim to disrupt the business model of disinformation, breaking the perverse incentives that exist to create and disseminate disinformation online. … GDI provides … data and intelligence to advise

---

[14] https://www.isdglobal.org/about/ (emphasis added)

[15] https://www.disinformationindex.org/

policymakers and business leaders about how to combat disinformation and its creators."[16]

43.    Defendants have no authority (statutory or otherwise) to fund or promote censorship technology or otherwise support censorship enterprises (private or public) that target the American press, branding disfavored domestic news organizations (*e.g.*, Plaintiffs) as spreaders of "disinformation" / "misinformation." Not only do Defendants not have the power to censor speech or the press, the Constitution also (namely the First Amendment) expressly forbids it. And, to make matters even worse, foreigners (ISD and GDI, for examples) are involved, at least in part, in treading on Americans' constitutional rights (namely, free speech / press).

44.    The full breadth of Defendants' censorship scheme cannot be fully known until discovery unfolds.[17] But, at a minimum, the Government (*e.g.*, DOS / GEC and DOD) has funded, promoted, and / or marketed to at least the American censorship enterprise that is NewsGuard Tech, and there is also evidence of Defendants' funding the foreign censorship enterprises that are ISD and GDI.[18, 19] These entities generate what are commonly known as "blacklists" of so-called ostensibly risky or unreliable American news outlets (*e.g.,* Plaintiffs), discrediting and tortiously demonetizing the disfavored press and redirecting money and audiences to news organizations that publish favored viewpoints,[20] by way of Big Tech (*e.g.*, Facebook) equipped with such "tools"

---

[16] *Id.*

[17] Because the breadth of Defendants' misdeeds is currently unknown sans discovery, Plaintiffs respectfully reserve the right to amend this Complaint to, among other things, modify named Defendants and, perhaps, named Plaintiffs. Part and parcel with this reservation of right, the above case style contains fictitious John Doe Defendants. And, as discovery unfolds and the breadth of Defendants' misdeeds is accordingly fleshed out, it may well be warranted to amend this Complaint to modify causes of action (not just parties); *e.g.*, it strongly appears as though Defendants (in whole or in part) were / are engaged in the unlicensed / unauthorized practice of medicine with respect to COVID prevention, treatment, *et cetera*.

[18] *See, e.g.,* CONTRACT to NEWSGUARD TECHNOLOGIES, INC. | USAspending and NewsGuard Claims It's Not Government-Funded, $750K Grant Suggests Otherwise (thefederalist.com)

[19] Facebook is listed as a Private Sector funding entity: https://www.isdglobal.org/partnerships-and-funders/

[20] *See, e.g.*, https://www.newsguardtech.com/solutions/newsguard/ ("NewsGuard data helps individuals, governments, companies, and organizations fight misinformation and teach media literacy through data integrations and other partnerships").

("blacklists"). Other variations of the "blacklist" generated by these entities are called "nutrition labels" or "advertising white lists."[21]

45.    Plaintiffs were / are scarlet-lettered as unreliable and / or risky by the Government-funded and Government-promoted censorship enterprise that is NewsGuard Tech, which such imprinting is then provided to Big Tech (*e.g.*, Facebook) for implementation (platform censorship),[22] injuring Plaintiffs by, among other things, starving them out of advertising revenue / web trafficking monies and reducing the circulation of Plaintiffs' reporting and speech.[23] All as a direct result of Defendants' unlawful and unconstitutional censorship scheme.

46.    As already alluded to above, and as discussed in greater detail throughout this Complaint, the Government-funded NewsGuard "tool," as well as the ISD and GDI "tools," discriminatorily peg Plaintiffs as sources of misinformation or malinformation (among other things). The discriminatory "blacklisting" of Plaintiffs, in and of itself, substantially damaged (and continues to damage) Plaintiffs by way of lost business revenues and lost prospective economic

---

[21] "Nutrition labels" and "white lists" are described in these articles, for example: NewsGuard Fights Fake News With Humans, Not Algorithms | WIRED and NewsGuard Offers Facebook, Google a Way to Address Fake-News Problem (businessinsider.com)

[22] Facebook is doubtless quite amenable to this relationship because while Facebook certainly is not opposed to crushing people and businesses (like Plaintiffs) by way of censoring such people and businesses on the Facebook platform, Facebook claims (pretends, we submit) to not be keen on personally carrying out the "misinformation" / "disinformation" / "unreliableness" / "trustworthiness" / "riskiness" assessment that leads up to and underlies censoring. Rather, Facebook has proclaimed (disingenuously / falsely, we submit) that neither "Facebook [n]or internet platforms in general should be arbiters of truth." ~ Mark Zuckerberg (May 2020 CNBC Interview). And, so, Facebook is doubtless quite amenable to this relationship of others (*e.g.*, NewsGuard Tech, ISD, GDI) carrying out for Facebook the "misinformation" / "disinformation" / "unreliableness" / "trustworthiness" / "riskiness" assessment that Facebook needs to carry out censoring on the Facebook platform. *See, e.g.*, the second news article cited in n. 21, *supra*.

[23] Sort of in the same vein as n. 22, *supra*, Facebook is doubtless quite amenable to starving Plaintiffs out of the news-media arena to foster Government's anti-competitive animus concerning social media space over which the Government and Plaintiffs compete relating to the dissemination of COVID-related information because Plaintiffs and Facebook are also competitors outside of the COVID-19 realm and elimination of Plaintiffs from the news-media market at Government's coercive behest accordingly kills two birds with one stone for Facebook; *i.e.*, puts Facebook in the good graces of the Government and its heavy-hand *and* augments Facebook's corporate profit by eliminating Facebook's competitor. Put differently, Facebook's elimination of Plaintiffs from the news-media market was / is dually motivated, serving Government's anti-competitive (speech) animus and Facebook's anti-competitive (money) animus.

advantage and / or business relationships, for examples. And such damage was / is compounded by Big Tech's (*e.g.*, Facebook's) conversion of the "blacklisting" into platform censorship / civil liberty restraint.

47. Upon information and belief, NewsGuard Tech's "blacklisting" of Plaintiffs was carried out at the Government's behest even by way of Defendants' funding (*e.g.*, Government funding NewsGuard, for example, and Big Tech funding ISD and GDI, as another example). Reason being, the Government had / has great interest in, for example and specific to this case, eradicating COVID / COVID vaccination critics such as Plaintiffs from the public eye (suppressing the speech of such critics into oblivion), and Big Tech had / has great interest in remaining in the Government's good graces and augmenting corporate profit in one fell swoop.

48. Plaintiffs actively endorse / promote, among other things, holistic approaches to bettering one's health that are contrary to the Government's COVID vaccine "mandates."

49. So, to ensure the public believed the only option was / is to accept the unknown / untested / unreliable Government-pushed COVID vaccinations (*i.e.,* to ensure there were no other credible alternative remedies / approaches / viewpoints to COVID), the Government acted to formulate the "tools" (through the likes of NewsGuard Tech, ISD, and GDI) necessary to suppress (*vis-à-vis* Big Tech / Facebook platform-oriented censorship) anyone who suggested otherwise (such as Plaintiffs).

50. Defendants' overt, coercive goal here was / is to "blacklist" anyone who contradicted(s) the Government (here, Plaintiffs) and to indicate that any such contradictory person / entity was / is an unreliable and / or risky source of information, providing only misinformation / disinformation, so as to result in the eradication of Plaintiffs on social media platforms such as Facebook, Google, and Twitter.

51.     Such Government induced / funded "tools" or "mediums" (*e.g.*, NewsGuard, ISD, GDI) are then utilized by Big Tech (*e.g.*, Facebook, Google, Twitter) at the Government's pressuring to "rationalize" / justify the Big Tech censorship / de-platforming scheme that unfolds. Upon information and belief, along the lines of *Missouri v. Biden*, Big Tech is coerced (*via* relentless pressure under threat, such as losing its Government civil liability "protections") by the Government into implementing the Government's censorship-oriented "tools."

52.     The Government's instruments of censorship are accordingly two-fold as it concerns Plaintiffs – wholly or partially at the behest of the Government, NewsGuard Tech and / or ISD and GDI manufactured(es) the tools by which to censor Plaintiffs and Big Tech carried(es) out such censorship. Put differently, NewsGuard Tech's and / or ISD's and / or GDI's Defendants-funded analyses / studies of Plaintiffs resulted in damaging "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" characterizations of Plaintiffs (*i.e.*, resulted in the scarlet letters affixed to Plaintiffs), which such (mis)characterizations served (in whole or in part) as the foundation for Big Tech's Government-induced (in whole or in part) extreme censorship of Plaintiffs.

53.     Upon information and belief, Government was motivated to strip Plaintiffs of their voices and economic well-being because Plaintiffs were Government's competitors in the space of healthcare and life sciences who did not, on several topics / issues, share the same viewpoints as Government or its officials.[24]

---

[24] Digital mediums (such as Plaintiffs) not sharing the COVID viewpoints of the Government or its officials presented (and presents) a major problem for the Government because digital mediums had gained (and continued to gain) a great deal of strength in the early 21st century (as opposed to "conventional" controlled paper or television news outlets). As of 2023, "a large majority of U.S. adults (86%) say they often or sometimes get news from a smartphone, computer or tablet, including 56% who say they do so often." This compares to only 37% of U.S. adults who often or sometimes get news from print publications. *See* Jacob Liedke & Luxuan Wang, *News Platform Fact Sheets,* Pew Res. Ctr. (Nov. 15, 2023), available at https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/. Of those who indicated they get their news digitally, 67% said they often or sometimes use news *websites* or *apps* as

54.     More specifically and for example, the Government and Plaintiffs were / are "competing" for public space as to how one's body needed(s) to be handled / approached in the treatment of COVID and / or in the avoidance of COVID. The Government did not like the news (information) that Plaintiffs were advancing on this front (and / or similar fronts) and the Government did not like the treatment regimen (the products) Plaintiffs were advocating for / endorsing on this front (and / or similar fronts). So, the Government, by way of its heavy-hand, (a) enlisted NewsGuard Tech and / or ISD and / or GDI to drum up / create the "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" analysis of Plaintiffs and (b) coerced Big Tech into converting such analysis into censorship (*i.e.,* Big Tech helped facilitate the Government's censorship). The first half of this (the NewsGuard Tech / ISD / GDI element) has been seen in at least one other relatively recent lawsuit (mentioned in n. 12, *supra*),[25] and the second half of this (the Big Tech element) has been seen in at least one other relatively recent lawsuit (*Missouri v. Biden*).[26]

***How NewsGuard, ISD, and GDI Manufacture The Censorship "Tools"***

55.     As digital mediums gained in size and strength, the Government conspired amongst Defendants to censor anyone (*e.g.,* Plaintiffs) that did / does not adhere to the preferred views of the Government.

56.     This lawsuit addresses the Government's funding and promotion of privately built censorship "tools" used by Government instrumentalities (*e.g.,* Facebook, Google, and Twitter, here) to censor Americans' speech, Government funded "tools" that specifically *blacklisted*

---

a news source, 50% said they often or sometimes use social media as a news sources, and 71% responded that they use Google or other search engines to get the news. *See id.*

[25] *See The Daily Wire, LLC, et al. v. Department of State, et al.*, No. 23-cv-00609-JDK (E.D. Tex. 2023).

[26] *See State of Missouri, et al. v. Joseph Biden, Jr., et al.*, No. 22-cv-01213 (W.D. La. 2022).

Plaintiffs, and "tools" intended to restrain Plaintiffs' ability to distribute competitive information. Government instruments (Facebook, Google, Twitter) used Government funded tools (*e.g.*, NewsGuard, GDI, ISD) to interfere with Plaintiffs' ability to advertise, monetize, and distribute competitive information (*i.e.,* competitive to Government and / or its officials). The intent is clear – restrain Plaintiffs' access to the digital market (the modern-day digital public square).

57.     DOS' GEC has taken a lead role in coordinating the Government's efforts to censor speech. GEC (a multi-agency center housed within the DOS) originated in 2011 as the Center for Strategic Counterterrorism Communications ("CSCC"), following the President Obama administration's issuance of an executive order that created the center to support federal agencies in targeting "violent extremism and terrorist organizations." *Regarding GEC taking a "lead role" in the industrial censorship complex plaguing America, Elon Musk recently admitted that multiple branches of the Government were involved in the social media censorship realm, but that GEC was perhaps the "worst offender," directing social medial platforms, such as Mr. Musk's Twitter, to eradicate / censor hundreds of thousands of users such as Plaintiffs (250,000++ Twitter users / accounts according to the evidence Mr. Musk was seeing at Twitter, which Mr. Musk admitted that Twitter largely, if not entirely, complied with).*

58.     In 2016, the President Obama administration issued a second executive order morphing the CSCC into the GEC but left its counterterrorism mission intact: "The Global Engagement Center replaced the Center for Strategic Counterterrorism Communications. The new strategy seeks to be more effective in the information space and is focused on *partner-driven* [*e.g.,* private – state] messaging and data analytics."[27]

---

[27] https://2009-2017.state.gov/r/gec/ (emphasis added)

59.     When Congress created the GEC, through its passage of the National Defense Authorization Act ("NDAA"),[28] the GEC's purpose was expanded beyond its original mandate of countering the influence of foreign terrorists. Specifically, the 2017 NDAA directed the GEC to "coordinate efforts of the Federal Government" to counter foreign state and nonstate "propaganda and disinformation efforts aimed at undermining United States national security interests."

60.     In 2019, the NDAA expanded the GEC's mission, authorizing it to counter foreign "propaganda and disinformation" that undermines not only the United States' national security interests abroad, but also the "policies, security, or stability"[29] of the U.S. and our allies.

61.     While Congress dramatically expanded the breadth of the GEC's mission, its purpose remained limited to combatting "*foreign*" disinformation – not *domestic* disinformation. Congress explicitly included a limitation that provided: "None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering *foreign* propaganda and misinformation that threatens United States national security."[30] While Congress expressly forbade the GEC from using appropriated funds to suppress domestic speech, many of the GEC's activities and initiatives targeted Americans' speech nevertheless.

---

[28] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1284, 132 Stat. 1636, 2076 (2018).

[29] https://www.state.gov/about-us-global-engagement-center-2/

[30] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. at 2548, (2016).

62. According to the DOS, the GEC's Technology Engagement Division ("TED")[31] "funded and supported the *Disinfo Cloud*[32] website,[33] an open-source platform that GEC's grantee partner maintained."[34] Disinfo Cloud[35] (DOS' alter ego) also maintained a Twitter account. The (DOS / GEC's) Disinfo Cloud Twitter Feed promoted the censorship enterprises of NewsGuard and GDI, and amplified GDI's posts expressly acknowledging its goal was to ensure websites deemed "disinformation websites" would be unable to profit from digital ads[36] (*i.e.,* the Government's goal was anticompetitive and unconstitutional).

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[31] https://www.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/global-engagement-center/technology-engagement-division/

[32] https://2017-2021.state.gov/disinfo-cloud-launch/

[33] https://disinfocloud.com/

[34] Office of Inspector General, United States Department of State, *Inspection of the Global Engagement Center,* September 2022, at 21, available at https://www.stateoig.gov/uploads/report/report_pdf_file/isp-i-22-15.pdf

[35] https://www.state.gov/defeat-disinfo/ The State Department's website contains this notice: "All good things must come to an end: with the start of the new year, the GEC's Disinfo Cloud platform and the Disinfo Cloud Digest have been retired as GEC-sponsored efforts. However, the GEC's work to elevate technology solutions to disinformation challenges continue with *new projects designed to adapt to the current environment*. Stay tuned for more information on the next iteration of this program!"

[36] @DisinfoCloud Tweets, Dec. 14, 2021, Dec. 20, 2021, available at https://twitter.com/DisinfoIndex/status/1472947344865906696; https://twitter.com/DisinfoCloud/status/1472957094961848324

https://twitter.com/NewsGuardRating/status/1470799423462596611.



63.    Many of the GEC's activities and initiatives were performed by the DOS' partners (NewsGuard, GDI, ISD), which the DOS specifically funded[37] to carry out Government censorship endeavors.

64.    DOS' Disinfo Cloud promoted censorship enterprises like NewsGuard and GDI through its weekly "Disinfo Cloud Digest," which began publishing for the DOS in December 2020. The Disinfo Cloud Digest featured censorship tools, used by American businesses, like NewsGuard's "Responsible Advertising for News Segment (RANS)" censorship tool, which Disinfo Cloud promoted in its April 6, 2021, Digest, stating that such technology "help[s] advertising companies avoid websites known to host or produce mis/disinformation."[38]

---

[37] https://www.washingtonexaminer.com/?p=2773271

[38] The Disinfo Cloud Digest, Apr. 6, 2021, available at https://myemail.constantcontact.com/New-tools--a--29M-counter-disinfo-fund--and-a-musical.html?soid=1134000290001&aid=6VULxmHPp-M.

65.     Disinfo Cloud users, including members of the private sector like Defendants Facebook, Google, and Twitter, are located within the United States, and were encouraged to submit requests to test the technology against their needs (*i.e.,* use the Government's censorship tools to censor domestically). The webpage directed users to ask Disinfo Cloud for assistance in drafting "a test proposal for a tool."

66.     The GEC's TED used Disinfo Cloud to run its "tech challenge" initiative.[39] The tech challenge initiative sought to identify and "advance" "innovative counter-disinformation tech solutions."[40] The censorship tools and technologies identified through the tech challenges targeted both *foreign* and *domestic* speech and included Government funded Tools used to target Plaintiffs.

67.     Many of the Disinfo Cloud censorship tools and technologies were funded, promoted, and / or marketed by the Government, including two media rating companies: GDI and NewsGuard. The DOS, through its alter egos (Government Tools), actively intervened in the digital media market, intent on anticompetitively rendering disfavored media, like Plaintiffs, unprofitable.

68.     In 2019, the GEC established its "Silicon Valley Engagement" ("SVE") initiative. Private American companies (*e.g.*, Facebook, Google, Twitter) were encouraged to join Disinfo Cloud, a platform initially established for .mil and .gov users, to identify "a technological solution" best suited to the specific tech company's (*i.e.,* the Government's instrument's) needs to scale "counter propaganda and disinformation." Through the Government's SVE initiative, the GEC

---

[39] The Disinfo Cloud Digest, Dec. 21, 2021, available at https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU (last visited November 21, 2023).

[40] Events—Technology Engagement Division, available at https://www.state.gov/upcoming-events-technology-engagement-division/ (last visited November 21, 2023).

marketed its censorship technology to private American social media companies (*e.g.*, Facebook, Google, Twitter).

69.      Disinfo Cloud marketed itself as a place "to identify and learn about technologies to counter adversarial propaganda and disinformation."[41] DOS' website further states that Disinfo Cloud allowed "stakeholders to search for assessed tools or technologies that fit identified needs or requirements,"[42] and offered users help in "identify[ing] appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs."[43] Government's goal here was tantamount to helping private companies censor disfavored American speech better, faster, and easier.

70.      DOS' webpage requested users (including Facebook, Google, and Twitter, for examples) to: "Write to inform TE[D] or Disinfo Cloud what your office needs to counter propaganda and disinformation. Ask us for assistance in identifying a technological solution."[44] Said differently, "we're not telling you what to censor, but the Government is going to help you censor better, by providing you with better censorship tools, so that you can be a better instrument of domestic censorship."

71.      Discovery in *Missouri v. Biden* revealed the GEC maintained a permanent disinformation liaison Samaruddin K. Stewart ("Stewart"), between the Government and Silicon Valley (*e.g.,* between Government and Government Instruments / Big Tech). Stewart helped set up meetings with social media platforms to discuss "countering disinformation" (*i.e.,* not

---

[41] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).

[42] Disinfo Cloud Flyer, *available at* https://www.state.gov/wp-content/uploads/2021/04/Disinfo-Cloud-flyer-April042921.pdf (last visited November 21, 2023).

[43] https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023) no longer available.

[44] *Id.*

specifically censoring foreign propaganda, but any disinformation). Among other things, Stewart offered private social media companies access to Government's Disinfo Cloud censorship tools, encouraging them to use those tools to "identify[], understand[], and address[] misinformation"[45] (*i.e.,* Government encouraged American companies to censor Americans' speech).

72.     A representative from GEC's TED, Alexis Frisbie, revealed "GEC's front office and senior leadership meets with social-media platforms every few months, sometimes quarterly," and these "meetings focus on the 'tools and techniques' of stopping the spread of disinformation on [*domestic*] social media . . . ."[46]

73.     Upon information and belief, the "tools and techniques" highlighted by the GEC's front office and senior leadership include censorship tools and instruments that abridged Plaintiffs' First Amendment rights.

74.     According to GDI's website, GDI is a "not-for-profit organisation" (sic) that "receive[s] funding from governments for specific *internationally-focused* research projects."[47]

75.     According to GDI, its "core output" is its Dynamic *Exclusion List* (*i.e.,* its *blacklist*) of websites and applications that purportedly hold a "high risk for disinformation."[48] And, according to its website, "GDI is periodically contracted by *governments* to conduct academic studies of the news ecosystems…"[49]

---

[45] *Id.*

[46] *See Missouri v. Biden,* ----F.Supp.3d----, 2023 WL 4335270 *36 (W.D. LA July 4, 2023), *rev'd in part*, No. 2330445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *cert. granted* in *Murthy v. Missouri*, 601 U.S. ----, --- S.Ct. ----, 2023 WL 6935337 (Mem).

[47] https://www.disinformationindex.org/about

[48] The Global Disinformation Index, What We Do, available at *https://www.disinformationindex.org/product* (last visited on March 14, 2024).

[49] *https://www.disinformationindex.org/about/* (last visited on March 14, 2024).

76.     GDI's webpage explains that it licenses its *Dynamic Exclusion List* (*i.e.,* its blacklist) to ad tech companies and platforms (*e.g.*, Facebook, Google, Twitter) so the "worst offenders" are defunded and down-ranked, "thus disrupting the ad-funded disinformation business model."[50] Translated, GDI is contracted by Government to provide a blacklist (*i.e.,* the Government's disfavored media sources) to companies like American social media companies (*e.g.*, Facebook, Google, Twitter) for the express purpose of "excluding" websites to "defund" and "disrupt the business model" of the blacklisted companies (including Plaintiffs).

77.     GDI is not the only Government-funded, Government-contracted, and Government-promoted blacklisting service. NewsGuard also compiles a list of American press outlets it characterizes as "unreliable."[51] "NewsGuard rates the more than 35,000 news sources responsible for approximately 95% of all the news and information consumed and shared online *in the U.S. …*"[52]

78.     According to its webpage, NewsGuard licenses its reliability ratings (*i.e.,* its blacklist) to domestic advertisers "to make decisions about which news sources to advertise on."[53] "NewsGuard's licensees include *search engines* [*e.g.,* Google] and platforms [*e.g.,* Facebook, Twitter], internet service providers [*e.g.,* John Doe], advertising companies [*e.g.,* John Doe], health and medical institutions [*e.g.,* John Doe], educational organizations [*e.g.,* John Doe], cybersecurity companies [*e.g.,* John Doe], *governments* [*e.g., Defendants*], researchers [*e.g.,* John Doe] and more."[54] All of which are clandestine instruments of domestic Government censorship.

---

[50] *Id.*

[51] NewsGuard Score and Rating Levels, available at https://www.newsguardtech.com/ratings/rating-process-criteria/

[52] NewsGuard FAQ, *available at* https://www.newsguardtech.com/newsguard-faq/ (last visited March 14, 2024).

[53] *Id.*

[54] NewsGuard FAQ: How Does NewsGuard make Money, available at https://www.newsguardtech.com/newsguard-faq/

79.     And, according to its webpage: "A [] portion of [NewsGuard's] revenue comes from *government* entities in Western democracies licensing NewsGuard's data about state-sponsored disinformation campaigns …" A portion of NewsGuard's revenue comes not only from the DOS, but also from the DOD.[55]

80.     Translated, NewsGuard receives Government funding from multiple Government agencies to rate the reliability of 95% of all U.S. news and information online, then licenses its blacklist to U.S. companies with the express intent of tortiously defunding companies that it deems unreliable.

81.     NewsGuard was recently quoted as stating the company's world-wide expansion "empower[s] *governments*, brands, advertising agencies, and non-profit organizations with *human-vetted* insights to support quality journalism and systemically defund sources of harmful misinformation."  In lay terms, NewsGuard provides biased opinions to "empower" Government and Government's private instrumentalities (*e.g.*, Facebook, Google, Twitter) to help "support" (*i.e.,* develop) favored information, and to help censor (*i.e.,* restrict) disfavored information, by, for example, tortiously interfering with advertising business relationships.

82.     According to Vox.com:

It's been a year since *Facebook deleted the page for [Plaintiff] Natural News* for violating the company's rules about spam. This was a big deal for Natural News, a conspiracy site that had attracted nearly 3 million followers on its Facebook page. Then in May, *Facebook took further action by banning [Plaintiff's] domain so that any link to the site would be blocked*, along with some pages that frequently shared its content. Still, Natural News content has found ways to stick around.

As one of the internet's oldest and most prolific sources of health misinformation and conspiracy theories, Natural News is a hub for climate change deniers and anti-vaxxers. While it poses as a news outlet, Natural News is actually a network of sites filled with bylined articles and flanked by ads for survivalist gear and dodgy health cures. ***The internet trust tool <u>NewsGuard</u> reports that Natural News "severely***

---

[55] https://www.usaspending.gov/award/CONT_AWD_FA864921P1569_9700_-NONE-_-NONE-

***violates basic standards of credibility and transparency."*** Various fact-checking organizations have repeatedly flagged Natural News content as false.

A new investigation from the ***Institute for Strategic Dialogue***, a think tank that focuses on countering extremism, finds that there are hundreds of active and inactive domains that point to *websites associated with [Plaintiff] Natural News.* It's through some of these domains that Natural News content can still end up being shared on Facebook, the researchers found. Facebook, meanwhile, has said that *Natural News was banned 'for spammy and abusive behavior, <u>not the content they posted</u>.'* Most recently, Facebook said its pages had used abusive audience-building tactics, including posting frequently and trying to evade the company's rate limits. [56]

83.    The Tools' blacklists ultimately reduce Plaintiffs' revenue, reduce their visibility on social media websites, reduce their ranking results from browser searches, reduces users' ability to post or even message links directed to Plaintiffs' websites, thereby reducing their reach, distribution, and access to the market, and otherwise negatively impacting their operations.



---

[56]    https://www.vox.com/recode/2020/6/25/21293246/facebook-misinformation-natural-news-conspiracy-theory (emphasis added) (referencing ISD's hit piece on Natural News: https://www.isdglobal.org/wp-content/uploads/2021/10/20211013-ISDG-NaturalNews-Briefing.pdf





84.     In its description of its Library Partnership Initiative provided to the Alaska Department of Education, NewsGuard writes: "We are also licensing our White List of legitimate news sites to advertisers, which will *cut off revenues* to fake news sites."[57]

---

[57]      NewsGuard          Library        Partnership         Initiative,   *available     at* https://library.alaska.gov/documents/webinars/dev/newsguard/webinar-slides.pdf (last  visited  March  14,  2024) (emphasis added)

85. As Vox.com pointed out, NewsGuard and GDI are not alone in their Government-sponsored domestic censorship endeavors. The GEC also funded[58] the ISD, a London-based (*i.e.,* foreign-situated) domestic censorship tool. It should be extremely disconcerting to all Americans that the Government is specifically funding foreign agents to help effectuate censorship of domestic speech.

86. According to the ISD website, funders of the ISD include Defendants: "US Department for Homeland Security (DHS)," "US State Department," "Facebook," "Google," and ISD's partners include Defendant: "Global Disinformation Index." [59]

87. According to an article written by the Thinking Coalition, *Analysis of the activities of the Institute for Strategic Dialogue*: [60]

> Many people are becoming increasingly aware of the infrastructure being created by *governments working hand-in-glove with Big Tech* in order to censor any form of dissent. Even two years ago this view would have seemed somewhat paranoid, but through the important disclosures made by Senators Grassley and Hawley, the Twitter Files and also Big Brother Watch's report on the Ministry of Truth, there is now irrefutable evidence that censorship is taking place on an unprecedented scale.
>
> Thinking Coalition's research on *Institute for Strategic Dialogue (ISD) corroborates* this widespread censorship, highlighting connections using an *interactive map* showing the unhealthy alliance between Big Tech, government agencies (mainly security related) and oligarch foundations who cooperate in order to shut down dissent.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[58] https://www.usaspending.gov/award/ASST_NON_SGE21023GR0096_1900

[59]   https://www.isdglobal.org/partnerships-and-funders/   *see also*   https://www.isdglobal.org/whats-the-shared-endeavour-fund/

[60]https://thinkingcoalition.org/institute-for-strategic-dialogue-network/ (citations omitted) (emphasis added)



Institute for Strategic Dialogue (ISD) connection map

88.     According to the DHS website (identified in the map above), in its *Fiscal Year 2023 Targeted Violence and Terrorism Prevention Grantee Abstracts*, the DHS granted ISD $817,129.52. "The Institute for Strategic Dialogue, through the Strong Cities Network ("SCN"), which it has managed since its launch in 2015, will work with several partners [*e.g.,* GDI] to fill

gaps in existing targeted violence prevention [*e.g.,* domestic extremist speech] support to smaller cities." [61]

89.    According to the SCN website,

*The Institute for Strategic Dialogue (ISD) worked with mayors and government partners to launch Strong Cities* at a meeting during the opening of the UN General Assembly in 2015. Since then, ISD has expanded and supported Strong Cities membership and has delivered its programming. ISD continues to host the Management Unit and contributes its research and expertise to meet the policy and practice needs of *cities and local governments* around the world. [62]

90.    Everywhere one looks, there is money flowing from Government agencies to private companies, and Government agencies working with private "partners" to suppress dissenting domestic speech. Below shows a map of the interconnections as they relate to Plaintiffs and Defendants in this specific case.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[61] https://www.dhs.gov/fiscal-year-2023-targeted-violence-and-terrorism-prevention-grantee-abstracts

[62] https://strongcitiesnetwork.org/resource/a-guide-for-mayors/ (emphasis added)



91.     All the Government-funded, Government-contracted, and Government-promoted blacklisting services provided by NewsGuard, ISD, and GDI ultimately converge on Defendants Facebook, Google, and Twitter.

92.     Discovery in *Missouri v. Biden* revealed Brighteon (at the very least) was being targeted by the Government:

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



**Description**

NOTICE of Filing Deposition Transcript and Exhibits of Brian Scully by Jayanta Bhattacharya, Jill Hines, Jim Hoft, Aaron Kheriaty, Martin Kulldorff, State of Louisiana, State of Missouri (Attachments: # 1 Scully Deposition Transcript, # 2 Scully Exhibit 1, # 3 Scully Exhibit 2, # 4 Scully Exhibit 6, # 5 Scully Exhibit 7, # 6 Scully Exhibit 9, # 7 Scully Exhibit 10, # 8 Scully Exhibit 11, # 9 Scully Exhibit 12, # 10 Scully Exhibit 13, # 11 Scully Exhibit 14, # 12 Scully Exhibit 15, # 13 Scully Exhibit 16, # 14 Scully Exhibit 17, # 15 Scully Exhibit 18, # 16 Scully Exhibit 19, # 17 Scully Exhibit 21, # 18 Scully Exhibit 23, # 19 Scully Exhibit 24, # 20 Scully Exhibit 27, # 21 Scully Exhibit 28, # 22 Scully Exhibit 29, # 23 Scully Exhibit 30, # 24 Scully Exhibit 31, # 25 Scully Exhibit 46, # 26 Scully Exhibit 49, # 27 Scully Exhibit 52, # 28 Scully Exhibit 59, # 29 Scully Exhibit 61, # 30 Scully Exhibit 62)(aty,Short, Tracy) (Entered: 03/04/2023)

PDF | TEXT

≡  Memes, Magnets and Micr...   204 / 232   —  100%  +  ⊡  ⟳                    ⬇  🖶  ⋮

Case 3:22-cv-01213-TAD-KDM   Document 209-3   Filed 03/04/23   Page 204 of 232 PageID #: 14065

Bibliography

"Health Nut News." Media Bias / FactCheck. Updated October 25, 2020. https://mediabiasfactcheck.com/health-nut-news/.

Health Ranger Report. "Dr. Christiane Northrup Gives New Details on Covid Vaccine Shedding / Transmission, Especially among Women." *Brighteon*. Accessed September 6, 2021. https://www.brighteon.com/2aaed9bc-aa22-4da2-bdf8-2b0f2059983a.

———. "Dr. David Martin — Covid Vaccine MRNA Code Is a BIOWEAPON Developed via a Digital SIMULATION." *Brighteon*. Accessed September 6, 2021. https://www.brighteon.com/309412a4-65e5-4bd6-a7c9-52805b5a6b93.

"An Anti-Vaccine Film Targeted To Black Americans Spreads False Information." *HealthLeaders*, June 9, 2021. https://www.healthleadersmedia.com/covid-19/anti-vaccine-film-targeted-black-americans-spreads-false-information.

Helderman, Rosalind S., et al. "How former Trump adviser Steve Bannon joined forces with a Chinese billionaire who has divided the president's allies." *Washington Post*, September 13, 2020. https://www.washingtonpost.com/politics/steve-bannon-guo-wengui/2020/09/13/8b43cd06-e964-11ea-bc79-834454439a44_story.html.

Hernandez, Gina. "New Prompts to Help People Consider before They Share." *TikTok Safety*, August 16, 2019. https://newsroom.tiktok.com/en-us/new-prompts-to-help-people-consider-before-they-share.

Hofstadter, Richard. "The Paranoid Style in American Politics." (Cambridge, MA), November 1964.

Hoft, Joe. "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



93.     According to a report released by ISD:  *The Boom Before the Ban: QAnon and Facebook*, ISD, NewsGuard, and Facebook are all collaborating:

> This report is a ***collaboration*** between the *Institute for Strategic Dialogue* (ISD) and the nonpartisan news-rating organisation *NewsGuard.* It analyses QAnon-related contents on *Facebook* during a period of increased activity, just before the platform implemented moderation of public contents spreading the conspiracy theory. [63]

94.     According to Google's Chrome web store:

> NewsGuard's ratings shields and labels help users know which news and information websites to trust.

---

[63] https://www.isdglobal.org/wp-content/uploads/2020/12/20201218-ISDG-NewsGuard-QAnon-and-Facebook.pdf

NewsGuard's reliability ratings for news and information sources help users make decisions about which news sources to trust—and avoid misinformation and disinformation.

Our ratings, scores, and Nutrition Labels for websites are displayed next to links on search engines and social media platforms and cover all the news websites accounting for 95% of online engagement.

Ratings are conducted by a team of experienced journalists using nine basic, apolitical journalistic criteria. Each site receives a trust score of 0-100, an overall rating level ranging from 'High Credibility' to 'Proceed with Caution,' and a thorough Nutrition Label report detailing the site's ownership and financing, content, credibility practices, transparency practices, and history.

NewsGuard is for personal use only. Any commercial, research, or other non-personal use of NewsGuard is strictly prohibited by our Terms of Service: https://www.newsguardtech.com/terms-of-service/ [64]

***How Big Tech Implements The Censorship***

95.    First, as discussed above, Government manufactures (and funds) the censorship tools (*e.g.*, NewsGuard, ISD, GDI) that it then pushes on (*via* immense coercion / pressure / threat) Big Tech to facilitate on Big Tech platforms. We now address how Big Tech carries that out.

96.    The Government's Instruments (*e.g.,* Facebook, Google, Twitter, and most of Big Tech) use anticompetitive, unlawful, and / or inequitable means to eliminate or severely diminish any threat to the competitive dominance of the Government (or its partners, Big Tech) over the digital information, advertising, and computer application ("App") markets.

97.    As to the Government's Instruments' anticompetitive animus, Facebook's plan, for example, is simple and admitted: "remove, reduce, and inform."[65] Translated, "remove, reduce, and *replace*" competitors' (actual or potential) competitive materials, thereby reducing their ability

---

[64] https://chromewebstore.google.com/detail/newsguard/hcgajcpgaalgpeholhdooeddllhedegi?pli=1

[65] https://about.fb.com/news/2019/04/remove-reduce-inform-new-steps/

to monetize, their ability to advertise, and their ability compete in the free market.[66] Big Tech's anticompetitive animus, illegal conduct, and / or inequitable conduct (all such wrongdoing stemming from independent legal duties owed by Big Tech to Plaintiffs outside the confines of Big Tech publishing or speaking) was / is, at least here, effectuated by Big Tech's arbitrary (unsubstantiated, at the very least) contention that its users' competitive materials purportedly violated ambiguous "Community Standards," followed by Big Tech's replacing its competitors' materials with its (and its partner's – the Government's) own self-benefitting materials.

98.    The Government's Instruments' aforementioned anticompetitive animus, illegal conduct, and / or inequitable conduct flowed from the desire to wield dominance across the digital information, App, and advertising markets to (a) extort users, like Plaintiffs, into paying for reach and distribution (*i.e.,* access to the market), while deceptively and artificially disrupting users' (here, Plaintiffs') preestablished organic (*i.e.,* free services) reach and distribution by disrupting users' ability to work with competing advertisers and / or to provide competitive information, or competitive Apps, or (b) otherwise eliminate users altogether from the public square.

99.    Put differently, because the Government's Instruments are the "'Interactive Computer Service' provider" ("ICS" and "ICSP"), *see* Title 47, United States Code, Section 230(f), they maintain dominant control over almost all of the Internet's digital information distribution market. Because of its dominant power in the "ICSP" market, Big Tech can force unsolicited content upon its own users, deceptively acting as a dominant "Information Content Provider" ("ICP"), *see id*., which naturally displaces other users' competitive materials, like Plaintiffs' solicited information. Simplified further – because the Government's "protected"

---

[66] Indeed, Facebook has openly admitted to its anticompetitive animus: "… so going after actors who repeatedly share this type of content [*e.g.*, financially motivated], and reducing their distribution, removing their ability to monetize, removing their ability to advertise is part of our strategy." ~ Tess Lyons (Facebook).

Instruments are the ICSP, they can act as the dominant ICP, forcing other ICPs, like Plaintiffs, out of the digital distribution ICP market.

100.    By deploying opaque "rules" that benefit themselves (and their partners; *e.g.,* industry and the Government) and harm rivals, Big Tech has successfully wielded its monopoly power across the digital information, advertising, and App markets to dictate the terms upon which its rivals (*i.e.,* its competitors like Plaintiffs) can(not) compete with Big Tech or its partners (Defendants). Big Tech abuses its monopoly power and protection in the digital ICS market to severely disadvantage anyone who dares use Big Tech's "free" ICS for their own financial purposes, shares competing ideas, or anyone who uses, for example, Facebook's "free" services to compete against Facebook, or its partners (Government), to provide better products at a lower cost.

101.    Big Tech uses its dominance over digital distribution control to extort more transactions to its own "sponsored"[67] (*i.e.,* paid for) advertising products, whereby Big Tech extracts inflated advertising fees to line its own pockets at the expense of the very users it purportedly services for "free;" *i.e.*, to starve its competitive users (here, Plaintiffs) out of the digital media news market for Big Tech's benefit and / or the Government's benefit.

102.    Big Tech uses its dominance over digital distribution and reach control to eradicate competing ideas, whereby the Government's Instruments remove anything they, or their partners (Government) do not agree with, reduce anything they do not value, and then replaces (*e.g.,* "informs") its users' information with information the Government's Instruments choose to develop / endorse, based on their own values and / or based on the values of its partners (*e.g.,* industry and Government).

---

[67] Tess Lyons (Facebook) explained: "if it says sponsored, that means someone spent money to increase its distribution."

103.    Big Tech's boundless anticompetitive behavior (*e.g.,* the fraudulent reduction of users' *free* distribution to extort *paid* distribution, or to restrain competing ideas in the same competitive market to prevent competitors from making money) has raised barriers to entry to artificially high levels, forced competitors like Plaintiffs out of (or severely curtailed participation in) the digital information market under negligent / deceitful / fraudulent pretext, dissuaded potential competitors from joining the market, and left Big Tech's few remaining organic competitors marginalized and unfairly disadvantaged, all of which, effectuates a chilling of free speech, free press, and the free market.

104.    The harm is clear – users audacious enough to use Big Tech's purportedly "free" ICS products and services to advertise organically (and for financial purposes) or to share competing ideas will be forced to earn less (or nothing at all) because of Big Tech's artificially reduced distribution, and Big Tech's (a) advertising business "partners" will pay more for Big Tech's artificially increased distribution than they would in an unfettered, freely competitive market whereby competitive pressure ultimately results in better engagement at lower cost for market, participants, and (b) Government partner will be appeased.

105.    The Government's Instruments' / Big Tech's anticompetitive animus and conduct hurts virtually everyone who uses the Internet, because as ICS users (like Plaintiffs) make less money from advertising, fewer users can offer to produce better quality products (*i.e.,* create quality inventory and share more information) and offer diverse viewpoints (speech) to the American public. As a result, recipient users receive less *solicited* materials and are forced to receive far more *unsolicited* materials, which Big Tech is paid to, or instructed to, provide them; *i.e.,* Big Tech is *consciously responsible*, at least in part, for the development / advancement of almost all information on its APP, acting as a dominant ICP (acting as a publisher / curator / content

developer in disguise).

106.    In the curation / development vein (in *prima facie* publisher capacity), Facebook has been quoted as follows, for examples:

- "… to have better monetization for publishers then we have today in Newsfeed because the relationship we will have there is that, unlike a Newsfeed where friends might see a link somewhere and might pass it along, in this case Facebook could potentially have a direct relationship with publishers in order to make sure their content is available in this, if it's really high quality content." ~ Mark Zuckerberg (Facebook).

- "We really want to, to the full extent that we can, build services that help to fund more investigative journalism and high-quality journalism." ~ Mark Zuckerberg. So that "new types of journalism can thrive." ~ Mark Zuckerberg (Facebook).

- "I would hope that we can be one of the ways that we can support [new high-quality journalism] and make that more sustainable both from a distribution and monetization perspective." ~ Mark Zuckerberg (Facebook).

- "We're making a series of updates to show more high quality, trusted news. Last week we made an update to show more news from sources that are broadly trusted across our community. Today our next update is to promote news from local sources." ~ Mark Zuckerberg (Facebook).

- "I've asked our product teams to make sure we prioritize news that is trustworthy, informative, and local." ~ Mark Zuckerberg (Facebook).

- "Newsfeed promotes high quality news." ~ Mark Zuckerberg (Facebook).

- "The hard question we struggled with is how to decide what news sources are broadly

trusted." ~ Mark Zuckerberg (Facebook).[68]

- "It will only shift the balance or news you see towards sources that are determined to be trusted." ~ Mark Zuckerberg (Facebook).

107.     In the curation / development vein (in *prima facie* publisher capacity), Google has been quoted as follows, for examples:

- "Computer algorithms determine what shows up in Google News. The algorithms determine which stories, images, and videos show, and in what order. In some cases, people like publishers and *Google News teams choose stories*."[69]

- "Google News *aims to promote* original journalism and expose users to diverse perspectives. It doesn't accept payments to expedite or improve a site's search appearance or ranking."[70]

- "Authoritativeness signals help prioritize high-quality information from the most reliable sources available. To do this, our systems are designed to identify signals that can help determine which pages demonstrate expertise, authoritativeness, and trustworthiness on a given topic, based on feedback from Search raters. Those signals can include whether other people value the source for similar queries or whether other prominent websites on the subject link to the content."[71]

- "The quality rater guidelines are more than 170 pages long, but if we have to boil it down to one phrase, we'd say they help make sure Search is returning relevant results from the

---

[68] Note that this relates back to the "blacklists."

[69] https://support.google.com/googlenews/answer/9005749?hl=en (emphasis added)

[70]     https://support.google.com/news/publisher-center/answer/9606702?hl=en&sjid=18149230632996078902-NA (emphasis added)

[71] https://newsinitiative.withgoogle.com/hownewsworks/approach/surfacing-useful-and-relevant-content/

most reliable sources available. Information quality is at the heart of Search, and our systems fundamentally work to surface high-quality information. The rater guidelines help raters determine if a planned improvement is meeting that goal by providing a clear, uniform definition that all raters use to assess the results they see. More specifically, high-quality information is content which demonstrates expertise, authoritativeness, and trustworthiness on a topic, or E-A-T for short. For example, a health site with content from doctors and produced by a medical institution would have a high level of what many would consider to be expertise, authoritativeness, and trustworthiness. The rater guidelines also define low-quality content on the web, such as content that spreads hate or seeks to deceive users."[72]

- "Our search quality raters provide us with insights and evaluate pages against our guidelines to help make sure our systems — and proposed improvements — are working as intended. What that looks like in practice is often a "side-by-side" test where a rater will look at two sets of Search results, one from the current version of Google and the other from an improvement we're testing."[73]

- "Raters review every page listed in the results set and evaluate that page against the query, based on our rater guidelines. They evaluate whether those pages meet the information needs based on their understanding of what that query was seeking, and they consider things like how authoritative and trustworthy that source seems to be on the topic in the query. To evaluate things like expertise, authoritativeness, and trustworthiness (again, sometimes referred to as "E-A-T") raters are asked to do reputational research on the

---

[72] https://blog.google/products/search/overview-our-rater-guidelines-search/

[73] https://blog.google/products/search/overview-our-rater-guidelines-search/

sources."[74]

- "The COVID-19 pandemic is impacting different communities in different ways. As cities and towns across the world respond with local policies and guidelines, the need for timely and authoritative local news and information is paramount. To help people navigate these complexities, we're working across our news products <u>to highlight the latest local guidance</u> and surfacing more content from local news publishers so users can understand how the virus is affecting their community."[75]

- "Local news plays a critical role in informing people about the virus' impact in their communities. The COVID-19 feature in Google News puts local news front and center with a dedicated section highlighting the latest authoritative information about the virus from local publishers in your area."[76]

108.    In the curation / development vein (in *prima facie* publisher capacity), Twitter has been quoted as follows, for examples:

- "If advertisers complain about an account we will turn off advertising for that account." ~ Elon Musk.

- "We have a policy against misinformation in three categories, which are manipulated media, public health, specifically COVID, and civic integrity election interference and voter suppression. That is all the policy we have for misinformation." ~ Jack Dorsey

- Twitter shut down thousands upon thousands of accounts (in excess of 100,000) that it tied to the Chinese government, contending that such accounts were pushing deceptive

---

[74] https://blog.google/products/search/raters-experiments-improve-google-search/

[75] https://blog.google/products/news/understand-how-covid-19-impacting-your-community/

[76] https://blog.google/products/news/ways-stay-informed-coronavirus-news/

narratives about Hong Kong protests, COVID, and more.[77]

- "When you're excited about something you've posted and want to share it with more people, you can promote it to increase its reach and help it find a bigger audience. Promoting a post is easy, and we provide tools to help you track progress and view results along the way."[78]

- "Who will see my promoted Post? We send your Post to the people who are most likely to appreciate your content. We model based on your current followers, given that your followers are the people who have opted in to see your Posts."[79]

- "X may include Promoted Accounts as suggestions for accounts for you to follow."[80]

- "Our account suggestions are based on algorithms that make personalized suggestions for you."[81]

- "A blog post by Rumman Chowdhury, Twitter's director of software engineering, and Luca Belli, a Twitter researcher, said the findings could be 'problematic' and that more study needed to be done. The post acknowledged that it was concerning if certain tweets received preferential treatment not as a result of the way in which users interacted, but because of the inbuilt way the algorithm works. 'Algorithmic amplification is problematic if there is preferential treatment as a function of how the algorithm is constructed versus the interactions people have with it.'"[82]

---

[77] Twitter deletes over 170,000 accounts, some of which tried to spin Covid-19 in China's favor | CNN Business

[78] How to increase your reach on X with X promotions (twitter.com)

[79] *Id.*

[80] https://help.twitter.com/en/using-x/account-suggestions

[81] https://help.twitter.com/en/resources/recommender-systems/account-recommendations

[82] Twitter admits bias in algorithm for rightwing politicians and news outlets | X | The Guardian

*Recapitulation*

109.    This case is about the Government's Instruments' / Big Tech's implementation of a nefarious business model, aimed at chilling competing ideas and competition generally. Distilled, this case is about the Government's Instruments' illegal, inequitable, and unconstitutional scheme, inconspicuously hiding in plain sight, whereby Big Tech leverages its dominant power over access to the digital information distribution market (*i.e.,* its ICS role) to artificially reduce the distribution of direct competitors (like Plaintiffs), while artificially increasing the distribution of Plaintiffs' straight-line competitors (*e.g.,* Big Tech's business partners and / or the Government).

110.    The Government's Instruments use deliberately ambiguous pretextual terms such as "spam," "clickbait," "misinformation," "disinformation," "sensational," "inauthentic," "fake news," or "problematic content," as so-called "good faith" justifications for their anticompetitive, illegal, inequitable, and unconstitutional actions, while also relying on what has wrongly become *unfettered* government immunity (*e.g.*, Title 47, United States Code, Section 230) to act illegally, inequitably, and unconstitutionally. Here, for example, Google operates in a digital information market entirely controlled by Google, which benefits Google, and in a market that lacks any oversight (judicially, administratively, or otherwise). It is the perfect recipe for antitrust / anticompetition / chilling of speech, amidst an unconstitutional Government-facilitated and Government-funded (among several other things) backdrop.

111.    Big Tech's overt scheme (coerced, at least in part, by Government and fueled, at least in part, by Government-developed and paid-for "tools" such as NewsGuard, ISD, and GDI) is obvious – remove / reduce (*i.e.,* steal / suppress) competitive users' established distribution through anticompetitive, illegal, inequitable, and unconstitutional manipulation, then offer-up / sell that distribution back to either the original user who lost it or offer it to that user's straight-line

competitors in the digital market (*e.g.,* Facebook's industry and Government partners).

112.    Using its dominant power as the ICSP, Big Tech prevents competitive users' materials (*e.g.,* advertising, competitive ideas, real intellectual, or physical property) from reaching the intended recipient who solicited that user's materials. Then Big Tech replaces / displaces that user's materials (*e.g.,* Facebook "informs" its users) with its *self-benefitting* (*e.g.,* "sponsored" ads), Apps (*e.g.,* Apps that benefit itself, or its partners such as the Government), or Government endorsed ideas. Big Tech's actions artificially prevent competitors (whether the competitors of Big Tech, the Government, or both), like Plaintiffs, from reaching their established audiences, prevents their competitors from monetizing, and illegally forces their competitors out of the Internet's digital information, advertising, and App markets.

113.    Texas antitrust / anticompetition laws (making up some of the below causes of action), for example, frown upon this kind of "industry partnership" (*i.e.,* partnership between Plaintiffs' straight-line competitors, such as the Government, and Big Tech), which such "industry partnership" could rightly also be called a "group boycott" and is per se anticompetitive. A classic unlawful group boycott involves a concerted attempt by a group of competitors (here, Government, the Tools, and the Government Instruments) to disadvantage other competitors (here, Plaintiffs) by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors (Plaintiffs) need in the competitive struggle or by cutting off access to a supply, facility, or market (*e.g.,* Interactive Computer Services) necessary to enable the boycotted firm to compete.[83]

114.    Big Tech's and the Government's anticompetitive, illegal, inequitable, and

---

[83] In the "group boycott" vein, Plaintiffs reserves the right to amend this Complaint (vis-à-vis a fleshing out of the John Doe co-defendants) when (and if) the full extent of the Government's Instruments' group collusion with industry comrades (*e.g.*, Apple, Twitter / X, YouTube, *et cetera*) manifests itself further in discovery.

unconstitutional "group" censorship scheme functions as follows: (a) solicit *favored* third-party materials with the offer to increase its digital distribution; *i.e.,* increased access to the digital market; (b) deceptively / artificially decrease the distribution of *disfavored* competitive user's materials; *i.e.,* decrease their access to the digital market; and (c) then displace the *disfavored* materials (*i.e.*, materials that do not benefit Big Tech, or contradict the Government's endorsed ideas) with the Government's Instruments' (*i.e.,* Big Tech's or the Government's) *favored* information, all while hiding behind purported blanket immunity (*i.e.,* 47 U.S.C. § 230 Government "immunity" that has been consistently and conveniently misapplied in overly broad, absurd, and unconstitutional ways over the past two and a half decades).

115.   The admitted strategy of Facebook (*i.e.,* to *"*remove, reduce, and inform"), for example, deceptively restricts access to the digital information market for less valued users and artificially increases access to the digital information market for its more valued users (*e.g.,* its business partner's and Government). The Government's Instruments' scheme is subtle and relatively ingenious, but contravenes Texas statute, is illegal, inequitable, and / or unconstitutional.

116.   Here, Big Tech took affirmative action, under the guidance and assistance of Governmentally funded "tools" and under the immense coercion / pressure / guidance / protection of Government to remove and reduce (*i.e.,* censor) Plaintiffs' ability to speak freely, advertise its products, and reduced Plaintiffs' ability to make money in a competitive market, through the artificial and unconstitutional restriction of Plaintiffs' access to the digital information market.

117.   Big Tech's actions are not done in "good faith" (*e.g.*, required by Title 47, United States Code, Section 230(c)(2)(A)) and / or done as a "Good Samaritan" (*e.g.*, required as the general provision / intelligible principle overarching all of Title 47, United States Code, Section 230(c)) per the requirement of the Government's Section 230 civil liability "protection."

118.   Big Tech's actions are deliberately anticompetitive, illegal, inequitable, and / or unconstitutional. Defendants deliberately harmed Plaintiffs' businesses based on their own anticompetitive and / or Government censorship animus, to prevent Plaintiffs from competing with the Government's Instruments, its industry partners, or its Government partners in the digital information, advertising, and App markets. And anti-competitive animus is the antithesis of a "Good Samaritan."

119.   Defendants certainly did not act in "good faith" or as a "Good Samaritan" when removing, reducing, and / or displacing Plaintiff's real property (*i.e.,* deleted, devalued, and / or rendered Plaintiffs' business inoperable) with its partner's (including Government's) favored materials and ideas, thereby preventing Plaintiffs (or heavily curtaining Plaintiffs, at the very least) from making money in a competitive digital information market.

120.   To be clear, this case is *not* about "good faith" / "Good Samaritan" content moderation decisions, because no specific material content was moderated at the time of the harm. This case is *not* about the use of Big Tech's ICSs, because Plaintiffs were not actively using Defendant's ICSs at certain times of the harm. This case is *not* about treating Big Tech as "the publisher or speaker" of any third-party information. This case is *not* about the impropriety of any content at all, because there was / is no specific content at issue here. Rather, this case is entirely about the Government's Instruments' anticompetitive, illegal, inequitable, and / or unconstitutional business / censorship scheme (in breach of various independent legal duties owed to Plaintiffs), utilizing its dominant ICS power to leverage access to the Internet's digital information market by removing, restricting, and replacing competitive information like that of Plaintiffs. This case is about Big Tech's illegal and unconstitutional conduct, intended to (a) interfere with Plaintiffs' business relationships, to prevent Plaintiffs from making money, to

prevent Plaintiffs from competing with the Government's Instruments (Big Tech) and / or its partners (the Government) in the digital information, advertising, and App markets, and to (b) effectuate the Government's chilling of "disfavored" speech, wrongly classified as "disinformation" by Government "tools" such as NewsGuard, ISD, and / or GDI.

121.    Defendants' unlawful, inequitable, and unconstitutional conduct (NewsGuard Tech's / ISD's / GDI's blacklisting of Plaintiffs and Big Tech's related censorship / blackballing of Plaintiffs, at the coercive behest and funding of the Government in whole or in part) has resulted in Plaintiffs experiencing (and continuing to experience to this day and most certainly moving forward) the following, for examples: (a) reputational damage; (b) reduced growth; (c) lost business opportunities / prospective economic advantage; (d) substantial monetary harm (*e.g.*, reduced advertising / web trafficking revenue; and (e) loss of voice / speech within Plaintiffs' marketplaces (news-media and holistic healthcare) or otherwise.

122.    Plaintiffs bring this action against Defendants for violations of Texas statutes, tortious / illegal conduct, inequitable conduct, and constitutionally repugnant conduct to halt Big Tech's (Government coerced, vis-à-vis "disinformation" "tools" such as NewsGuard, ISD, and / or GDI) anticompetitive racket, loosen Big Tech's (and its partner, Government's) monopolistic grip on the Internet's digital information, advertising, and App markets (*i.e.,* the dominant ICS grip on the ICP market, inspired / coerced by Government at least in part), and restore competition (economic, political, philosophical, ideological, *et cetera*) to the Internet's digital information, advertising, and App industry by, in large part, eradicating the immense chilling of free speech carried out by Defendants.

123.    This lawsuit seeks monetary redress for the illegalities perpetrated against Plaintiffs by the most direct, most proximate of wrongdoers – NewsGuard Tech, ISD, Facebook,

Google, and Twitter.[84] This lawsuit also seeks non-monetary redress (injunctive relief) as to all wrongdoers – the Government in addition to NewsGuard Tech, ISD, and Big Tech. As to the former aim, the amount in controversy (exclusive of attorneys' fees, costs, and interest) well exceeds $75,000.00.

***Relevant Principles Re: Counts VIII – XII Below***

I.     **The 1st Amendment Prohibits Abridgment Of The Right To Freedom Of Speech And Press**

124.    The First Amendment prohibits the federal government from "abridging the freedom of speech, or of the press." U.S. CONST. amend. I.

125.    The prohibition against the abridgement of Freedom of Speech and Freedom of Press applies to all branches of the government, government entities, and government actors. *See, e.g.*, *Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017).

126.    The right to Freedom of Speech is robust, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), ensuring "that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S.Ct. 1730, 1735 (2017).

---

[84] To be clear, NewsGuard Tech, ISD, GDI, and Big Tech were the Defendants who maligned and censored Plaintiffs, with the Government coercively fostering the wrongdoing (the blacklisting and the blackballing / censorship) and funding (in whole or in part) the wrongdoing. In this sense, Government was the aider and abettor of NewsGuard Tech, ISD, GDI, and Big Tech. "Aid and abet" is defined as follows:

> Aid and Abet means to assist someone in committing or to encourage someone to commit [illegalities.] … [A] person aids and abets the commission of a[n] [illegality] when he or she, acting with knowledge of the unlawful purpose of the perpetrator, and the intent or purpose of committing, encouraging, or facilitating the commission of the offense … promotes, encourages or instigates the commission of the [illegality].

https://www.law.cornell.edu/wex/aid_and_abet. The Government doubtless embraces its "ancillary" role in the overall malignment and censorship scheme at issue here because, again, the Government does not have the power to censor speech or the press, and the Constitution (namely the First Amendment) expressly forbids as much. This is not to say the other Defendants have such power – they do not. But the Government especially does not have any such power; indeed, the Government is tasked with upholding the Constitution, not undermining it.

127.    And "as a general matter, social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), vacated on other grounds, 141 S. Ct. 1220 (2021).

128.    Further, the right to Freedom of Speech reaches all "field[s] of human interest," *Thomas v. Collins*, 323 U.S. 516, 531 (1945), and, "[]as a general matter, ... government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citation omitted). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

129.    "[D]ecisions [by governmental officials] to list particular publications as objectionable" constitute an unconstitutional "system of prior administrative restraints" without judicial oversight. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70–71 (1963).

130.    Governmental expression of opinions about particular social media posts publicly and transparently is generally legal. Doing so contributes to the national debate by subjecting those expressions to the marketplace of ideas and to criticism. But when the Government "blacklists" (vis-à-vis Government-funded tools such as NewsGuard, ISD, and GDI, the "tools"), especially behind closed doors where no one else knows or can criticize the blacklist, they unlawfully participate in shutting down debate. And that problem is compounded by Government equipping Big Tech with aforementioned "tools" and exerting extreme pressure / coercion on Big Tech to implement such tools in censorship of others (such as Plaintiffs).

131.    Further, while the Government generally has the authority to publicly express

disagreement with private speech or the press, that does not imply the authority – overtly or covertly – to fund and promote censorship tools that blacklist the press or Americans' speech (the Plaintiffs).

132.    The Supreme Court has held that even "false statements, as a general rule" are not "beyond constitutional protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Thus, merely labeling disfavored speech as "disinformation," "misinformation," or "mal-information" does not strip it of First Amendment protection.

133.    "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

134.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech ... it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* at 723.

135.    "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

136.    SCOTUS continued in *Alvarez*:

The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of Speech and thought flows [sic] not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open,

dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.

*Id*. at 728.

137.    The Press Clause also "comprehends every sort of publication which affords a vehicle of information and opinion," *Lovell v. Griffin*, 303 U.S. 444, 452 (1938), and the guarantee of Freedom of the Press does not change depending on the publication's characteristics or third-party ratings, for "freedom to publish means freedom for all and not for some." *Assoc. Press v. United States*, 326 U.S. 1, 20 (1945).

138.    Further, Freedom of the Press "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Id*.

139.    To that end, the constitutional protection of Freedom of the Press is exceedingly broad and while it undoubtedly protects against prior restraints on publication, it is not limited to "any particular way of abridging" the right, for "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean v. American Press Co.*, 297 U.S. 233, 249-250 (1936) (quoting 2 Cooley's Constitutional Limitations, 8th ed., p. 886).

140.    As such, SCOTUS has long afforded constitutional protection to the press to disseminate the news, for "liberty of circulating" is essential to a free press, and "without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex Parte Jackson*, 96 U.S. 727, 733 (1877)).

141.    The Government abridges Freedom of the Press by "penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Grosjean*, 297 U.S. at 251.

## II.    Defendants May Not Directly Or Indirectly Abridge The 1st Amendment Rights Of Its Citizens

142.    The Government Defendants (and Government actors – NewsGuard, ISD, GDI, Facebook, Google, Twitter) have no statutory authority to censor speech and the press. It follows that they also lack the power to attempt to censor speech and the press, and they lack the power to ask others to censor speech and the press.

143.    Plaintiffs need not establish that they were censored, suppressed, or silenced directly by Government action; they need only establish the Government Defendants abridged their First Amendment rights.

144.    The First Amendment itself establishes that principle: It bars any law or government policy from "abridging" Freedom of Speech or Freedom of the Press. Thus, what matters in assessing whether the Defendants have violated the First Amendment is whether the Defendants' actions have had the consequence of abridging Freedom of Speech or Freedom of the Press, not whether Defendants have acted directly, not whether a private partner has become a Government actor, and not whether Government has acted coercively or with undue pressure – for it is "axiomatic" that the Government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Although, as discussed above, the Government certainly has acted coercively and with undue pressure as to the private entities making up the rest of the named Defendants.

145.    Indeed, whereas the First Amendment bars the Government from "prohibiting" the free exercise of religion, it forbids the Government from even so much as "abridging" Freedom of Speech or Freedom Press. Const. Amend I. Accordingly, in a First Amendment claim, the constitutional question is simply whether the Government (and / or its actors) has been abridging (*i.e.*, diminishing) protected speech or the press.

146.    As detailed above and as further explained in the individual counts, the Defendants' actions abridge Plaintiffs' First Amendment rights.

147.    Courts can enjoin federal officials who censor speech and the press. *See Am. Sch. Of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (reversing the dismissal of a request for an injunction against the Postmaster General's alleged censorship of mail); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials.").

148.    Further, "the history of past censorship provides strong evidence that the threat of future censorship is not illusory or speculative," making declaratory and injunctive relief appropriate. *See Missouri v. Biden*, ----F.Supp.3d----, 2023 WL 4335270 *60 (W.D. LA July 4, 2023), rev'd in part, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), cert. granted in *Murthy v. Missouri*, 601 U.S. ----, --- S. Ct. ----, 2023 WL 6935337 (Mem).

149.    The Government (and / or its actors) also violate the First Amendment when they "deliberately set out to achieve the suppression of publications" through "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (even where private party is "free" to ignore Government's "advice" because its refusal would violate no law, it is still state action when the Government induces a private party to suppress speech).

150.    It is enough to show that the Government's funding, support, and collusion with private parties "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry." *Rosenberger*, 515 U.S. at 836.

151. Additionally, the actions of private actors are imputed to the Government when (a) it provides "significant encouragement" to the private actors, *Blum v. Yaretsky*, 457 U.S. 991, 1004; (b) when the private actors operated as willful participants in joint activity with the Government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 992, 941 (1982); or (c) when private actors jointly engaged with Government actors to carry out constitutionally forbidden actions. *Dennis v. Sparks*, 449 U.S. 24 (1980).

152. State action through joint engagement also occurs when the Government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).

153. Joint action may also be proven by showing that Government officials and private parties have acted in concert in effectuating a particular deprivation of constitutional rights. *See, e.g., Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

154. Further, private acts may constitute joint state action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id.* (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

155. Joint activity also occurs when the Government has "so far insinuated itself" into the private affairs of a non-governmental entity that the line between public and private action is blurred. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). In such circumstances, the Government's entanglement with the management and control of private entities will impute private action to the government. *Evans v. Newton*, 382 U.S. 296, 299 (1966).

156. Likewise, the Government is responsible for private action "when it has exercised

coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). As recognized in *Trinity Lutheran v. Comer*, 582 U.S. 449, 450, 463 (2017), such coercive power includes "indirect coercion," such as a very minor monetary inducement.

157.   Thus, private action may be rendered state action in many ways including where the Government finances and assists in the development of censorship technology, promoting censorship technology, and / or providing Government technology and resources to private actors to effectuate a censorship scheme. *See, e.g. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 606, 606-12, 615 (1989) ("Government did more than adopt a passive position toward the underlying private conduct.").

158.   Upon information and belief, the Government has provided "significant encouragement" to the Tools and Instruments to limit the circulation and / or distribution of Plaintiffs' news reporting and speech. Upon information and belief, this encouragement has directly resulted in the private companies (NewsGuard, ISD, GDI, Facebook, Google, Twitter) downranking Plaintiffs' journalism in search results, and de-amplifying, deplatforming, de-boosting, demonetizing, suspending, shadow-banning, restricting, or limiting access, and / or posting warnings on their news reports and coverage. Such private conduct thus constitutes state action imputed to the Government.

159.   Through the efforts described above, the Government has also become entwined in the management and control of those entities that developed censorship technology – technology that work to limit the distribution of Plaintiffs' reporting. This further establishes that the private companies' censorship activities qualify as state action imputed to the Government.

160.   The private actors whose censorship technology the Government has

funded, marketed, and promoted (in particular, NewsGuard, ISD, and GDI but also unknown and untold others) have operated as willful participants in joint activity with the Government to unconstitutionally censor the American press and Americans' speech. Their conduct is accordingly imputed to the Government as state action as well.

161.    The private actors (NewsGuard, ISD, GDI) coordinated with Big Tech, or otherwise participated in the Government's efforts to censor American press outlets and speakers, operated as willful participants in joint (unconstitutional) activity with the Government. Their conduct thus also constitutes state action that is imputed to the Government.

162.    Even if the Government did not censor by means of contract and encouragement (they did), they violated the First Amendment by offering coordination. Even if the Government was not seeking censorship (they were), and even if the censorship was performed independently by private corporations (it was not), private corporate censorship cannot be effective unless it is coordinated across different platforms. The platforms need coordination to ensure they are all censoring the same sorts of materials and not just driving customers to competitors.[85] But the companies (Facebook, Google, Twitter, *et cetera*) themselves cannot coordinate without antitrust difficulties. So, they need Government coordination. By supplying such coordination, the Government is abridging Plaintiffs' Freedom of Speech and Freedom of the Press.

163.    "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F.Supp.3d 94, 115 (N.D.N.Y. 2018).

---

[85] There have been many examples of what is commonly called "deplatforming" or "depersoning," which is coordinated attack across all platforms.

164.     Where (as here) the Government financed, encouraged, and rewarded / protected private actors for adopting the Government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

### III.     Agencies Can Only Exercise Congressionally Delegated Authority

165.     [A]gency actions beyond delegated authority are ultra vires and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54, 65 (D.D.C. 2016).

> At common law, the ultra vires exception to sovereign immunity provides that where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. Such actions are ultra vires [*i.e.*, beyond] his authority and therefore may be made the object of specific relief. To invoke this exception, a plaintiff must do more than simply allege that the actions of the officer are illegal or unauthorized. Rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority. Under the common-law ultra vires doctrine, then, a strong merits argument is needed to overcome sovereign immunity – even at the pleading stage.

*Apter v. Dep't of Health & Human Services*, 80 F.4th 579, 587–88 (5th Cir. 2023) (cleaned up, citations omitted).

166.     Courts look to an agency's enabling statute to determine whether the agency has exceeded its authority, and enabling legislation is "generally not an 'open book to which the agency [may] add pages and change the plot line.'" *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

167.     Where there is "no clear expression of congressional intent" in an agency's enabling statute to convey broad authority, a court will not infer it. *See BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021).

168.    This tenet dates to the nation's founding. As Alexander Hamilton explained, in a constitutional order that assigns the lawmaking and appropriations powers to the legislature, "no money can be expended, but for an object, to an extent, and out of a fund, which the laws have prescribed." Alexander Hamilton, Explanation, in The Works of Alexander Hamilton, Vol. 8, p.128 (Henry Cabot Lodge ed., 2d ed. 1903) (emphases in original).

169.    The Government's organic statute charges its Secretary of State, for example, with enumerated duties "respecting foreign affairs." 22 U.S.C. § 2656.

170.    According to DOS, for example, its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive." Congress appropriates funds to the DOS for "the administration of foreign affairs." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023.

171.    The statute which confers authority upon the DOS, for example, provides that:

The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [sic] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.

22 U.S.C. § 2656 (emphasis added).

172.    The Government's disinformation tools were developed not merely to assist in gathering information, but as tools of warfare – information warfare – to shape the perceptions and opinions of others. These mechanisms of information warfare, which were developed in the context of national security, foreign relations, and to combat American adversaries abroad, have been misappropriated and misdirected to be used at home against domestic political opponents and

members of the American press with viewpoints conflicting with those of the Government. By targeting domestic political disagreement, the Government violated the organic statute, as well as the most fundamental principles upon which our Constitution was founded.

173.     Any Government scheme designed to fund, support, and encourage private companies for the purpose of censoring, degrading, or demonetizing American press outlets falls outside the statutory authority of the DOS and the Government as a whole. The statutory language also does not authorize the Government to encourage the private sector to adopt censorship technology that will suppress certain content and viewpoints of the American press. Nor could it, consistent with the Government's enumerated powers and the First Amendment.

174.     Further, even if such a scheme were lawful – which it never could be – its funding would require a lawful appropriation by Congress. Sans such appropriation, the funding would violate the Anti-Deficiency Act, which prohibits federal agencies from obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Thus, the provision of Government funds and technology to outside entities to violate the First Amendment is doubly prohibited by law.

### IV.     Congress Cannot Delegate Authority Violative Of The Constitution

175.     Congress' authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. at 566; see also Const. art. I, § 8.

176.     "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176 (1803).

177.     Congress is prohibited from conferring on a federal agency power or authority that

is contrary to the Constitution, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986), and Congressional enactments that exceed Congress's constitutional bounds are invalid. *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).

V.   **The Government's Funding, Development, Marketing, And Promotion Of Private Censorship Tools, Technologies, And Censorship Enterprises Is A Non-Final, Unlawful Agency Action That Must Be Enjoined**

178.   Under the Administrative Procedure Act ("APA"), sovereign immunity is waived to non-monetary claims challenging non-final agency action as ultra vires.

179.   Government's censorship scheme is ultra vires and must be enjoined.

180.   Litigants can use the APA to assert ultra vires claims against Government actors and overcome sovereign immunity that would otherwise protect those Government actors. *Apter*, 80 F.4th at 587.

181.   "Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Id*. at 589 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702)).

182.   "[A] non-statutory cause of action under the APA (that is, an ultra vires claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id*. at 592 (citing *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014)).

183.   The 1976 amendment to 5 U.S.C. § 702 "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

184.     Section 702's waiver "applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA. There is no requirement of 'finality' for this type of waiver to apply." *Alabama-Coushatta Tribe*, 757 F.3d at 489.

185.     Per *Apter*:

When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an ultra vires claim – section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.

*Apter*, 80 F.4th at 589–90 (cleaned up, citations omitted).

186.     Under the APA, "'agency action' includes the whole or a part of an agency ... relief." 5 U.S.C. § 551(13).

187.     "'[R]elief' means the whole or a part of an agency grant of money, assistance, license, authority, exemption, exception, privilege, or remedy." 5 U.S.C. § 551(4).

188.     Thus, the Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises is "relief" under the APA, and accordingly constitutes "agency action."

189.     Plaintiffs' injuries are in the APA's "zone of interests."

190.     In keeping with Congress' evident intent when enacting the APA to make agency action presumptively reviewable, the zone-of-interests test is not especially demanding. *Apter*, 80 F.4th at 592; *Texas v. United States (DACA Case)*, 50 F.4th 498, 520-21 (5th Cir. 2022). The test is satisfied if the claims are arguably within the zone of interests to be protected by the statute. *Apter*, *supra*; DACA at 521. The Supreme Court has always conspicuously included the word

arguably in the test to indicate that the benefit of any doubt goes to the plaintiff. *Apter*, *supra*; *DACA*, *supra*. Review is foreclosed only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. *Apter*, *supra*; *DACA*, *supra*.

191.    This challenge is within the APA's zone of interests. For Plaintiffs, the Government's illegal relief limits their ability to distribute and profit from their speech.

192.    Moreover, illegal relief is explicitly covered by the APA, and thus the Government's ultra vires relief explicitly falls within the APA's zone of interests, as do the injuries resulting from that ultra vires relief.

193.    Consequently, the Government lacks sovereign immunity to Plaintiffs' claims against the Government (Counts I-V, *infra*).

## VI.    Alternatively, The Government's Funding Of Private Censorship Tools Is Final Agency Action That Must Be Set Aside And Vacated

194.    The APA authorizes courts to hold unlawful and set aside final agency action found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law ... ." 5 U.S.C. § 706(2)(A)-(D). The Government Defendants' conduct violates each of these prohibitions.

195.    In the Fifth Circuit, the "final agency action" requirement is a jurisdictional threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).

196.    Even agency advisory opinions can be deemed to have "consummated the

Department's decisionmaking process." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022).

197.    Further, "the mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

198.    The Government's secretive scheme to suppress, defame, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and / or promoting censorship tools, technology and censorship enterprises operating in the United States – specifically the censorship-by-risk-rating technology and entities – constitutes final agency action under the APA.

199.    The Government's scheme as alleged herein constitutes "final agency action" because no further action is needed and it thus "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

200.    Further, the Government's scheme as alleged herein entails actions by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*.

201.    The Government's scheme alleged herein clearly constitutes "consummation" of the agency's decision-making process and is not tentative or interlocutory. *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

202.    Nothing in the governing statutes gives or purports to give the Government the power to fund or participate in this scheme. The Government's conduct thus exceeds any statutory authority and is unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

203.    Further, the Government's conduct is "contrary to constitutional right, power,

privilege, or immunity" because it violates the First Amendment rights of Plaintiffs, as set forth above. 5 U.S.C. § 706(2)(B).

204.    Moreover, under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

205.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

206.    The Government's censorship scheme is arbitrary and capricious because it has been entirely secretive and non-transparent. Government has not even attempted to explain, let alone satisfactorily, how it serves the DOS' charge to, for example, manage foreign affairs. Nor could it, as this scheme has regulated domestic media content and speech without any basis in law to do so.

207.    The Government's scheme is also arbitrary and capricious because it is being deployed to promote the federal Government's preferred viewpoints while suppressing dissent therefrom.

208.    For the foregoing reasons, the Government's conduct is arbitrary, capricious, and an abuse of discretion and must be set aside.

209.    In sum, the entire initiative described above exceeds any conceivable statutory authority and is accordingly invalid under the APA. See 5 U.S.C. §§ 706(2)(A)-(D).

### COUNT I – ABRIDGEMENT OF PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH (RE: ALL DEFENDANTS)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

210.     The text of the Constitution's First Amendment is clear.

211.     Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

212.     The Defendants have abridged Plaintiffs' right to freedom of speech by funding and assisting in the development of, marketing, and / or promoting censorship technologies – in particular, the censorship-by-risk-rating technology and related entities (*e.g.*, NewsGuard, ISD, GDI) that is used to censor Plaintiffs' speech by Big Tech.

213.     Plaintiffs face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship, all as a direct result of the Defendants' unlawful conduct.

214.     Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-V, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment /

proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT II – ABRIDGEMENT OF PLAINTIFFS' RIGHT TO FREEDOM OF THE PRESS (RE: ALL DEFENDANTS)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

215. The First Amendment to the United States Constitution prohibits Congress from making laws "abridging" the freedom of the press, U.S. CONST. amend. I. Any law or policy that "abridges" or reduces the sphere of constitutionally protected freedom of the press thus violates the First Amendment.

216. The Defendants have abridged Plaintiffs' right to freedom of the press by funding and assisting in the development of, marketing, and/or promoting censorship technologies – in particular, the censorship-by-risk-rating technology and entities – that are used to censor Plaintiffs' reporting.

217. The Defendants' conduct inflicted past injury, and continues to inflict present, ongoing, imminent, and continuing irreparable injury on Plaintiffs by, among other things, reducing the revenue, reach, readership, and circulation of their reporting and speech, and otherwise negatively impacting the operations of Plaintiffs.

218. Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship – all as a direct result of Defendants' unlawful conduct.

219. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of Defendants' conduct. Defendants' conduct

is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-V, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT III – *ULTRA VIRES* NON-FINAL AGENCY ACTION BEYOND STATUTORY AUTHORITY (RE: THE GOVERNMENT)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

220.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1.

221.    As the Supreme Court has recently clarified, "[t]he nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

222.    Nonetheless, within the confines of the nondelegation doctrine, Congress may seek assistance from another branch, but "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

223.    No federal statute authorizes the Government to engage in the conduct alleged herein.

224.     The Government's funding, development, marketing, and promotion of private censorship tools, technology, and censorship enterprises constitutes "relief" under the APA, and is therefore "agency action."

225.     Further, just as it "strains credulity" to accept the CDC's position that a "decades-old statute that authorizes it to implement measures like fumigation and pest extermination," authorizes the CDC to "impose[] a nationwide moratorium on evictions," it "strains credulity," to imagine the Government's organic statute authorizes a secretive scheme to fund the development of censorship tools, technology, and enterprises – or to promote, test, and market that technology and those censorship enterprises to the American private sector, including web browsers and social media companies. *Cf. Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. ___, 1 (2021) (slip op.).

226.     This conclusion is reinforced by the fact the Government's scheme is unprecedented in history. Indeed, its organic statute has never been interpreted to authorize the regulation of the American press, much less a multi-agency scheme to fund the development of censorship tools and technology designed to silence speech by Americans, in America, for Americans and then to promote, test, and market such technology to the private sector. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate ... we typically greet its announcement with a measure of skepticism.").

227.     Not only is this action unauthorized by Congress, but Congress expressly prohibited the funds, appropriated or otherwise, made available to GEC from being used other than to counter "foreign" propaganda or disinformation.

228.     Congress likewise limited NED's (DOS' National Endowment for Democracy) use of grant funds to those activities consistent with its statutorily defined purposes, 22 U.S.C. § 4412. Importantly, by statute, the DOS' NED's purpose is solely to further Democracy abroad. 22 U.S.C. § 4411.

229.     Moreover, Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause seeks "to assure that public funds will be spent according to the letter of the budgetary judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id*. at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

230.     "All funds belonging to the United States—received from whatever source, however obtained, and whether in the form of cash, intangible property, or physical assets – are public monies, subject to public control and accountability." *See generally*, Kate Stith, Congress' Power of the Purse, 97 YALE L.J. 1343, 1356 (1988). Executive agencies may spend funds on a program only if they can convince Congress to appropriate the money. This applies not only to direct grants, but also to the vast diversion of government technology, support, employee time, and promotion efforts.

231.     Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury ... only if the law specifically states that an appropriation is made[.]" *Id*. at § 1301(d).

232.    The expenditure of public funds that were not lawfully appropriated for that purpose violates the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Federal employees who violate the Act are subject to sanctions, including removal from office, fines, imprisonment, or both. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990). "The misappropriation or disposition of public funds, or of any money or thing of value of the United States, or of any department or agency thereof, or any property made under contract for any department or agency thereof for an unauthorized use" constitutes a federal crime punishable by fines and imprisonment. *See* 18 U.S.C. § 641.

233.    By funding censorship tools and technology and censorship enterprises that seek to silence members of the American press and speech, the Government acted in an ultra vires manner.

234.    GEC (part of the Government Defendants) further acted in an ultra vires manner by using misappropriated funds to develop, promote, test, and/or market censorship tools and technology and censorship enterprises to the private sector, including web browsers and social media companies, seeking the silencing of disfavored elements of the American press.

235.    Because no Act of Congress "specifically states that an appropriation is made" to fund this censorship scheme, DOS' expenditure of public funds, as well as its expenditure of government technology and resources, including human resources, through GEC, is unconstitutional.

236.    Because GEC's actions are ultra vires, these actions must be declared invalid and enjoined.

237. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government's conduct. Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request (a) immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-V, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT IV – UNLAWFUL FINAL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (RE: THE GOVERNMENT)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

238. The Government's conduct violates the APA because its conduct constitutes final agency action and is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

239. The Government's conduct also violates the APA because its conduct constitutes final agency action and is "(B) contrary to constitutional right, power, privilege, or immunity" of Plaintiffs. 5 U.S.C. § 706(2)(B).

240.     Additionally, the Government's conduct violates the APA because its conduct constitutes final agency action and is "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

241.     Further, the Government's conduct violates the APA because its conduct constitutes final agency action and Government failed to observe the "procedure required by law ... ." 5 U.S.C. § 706(2)(D).

242.     In sum, the entire initiative described above violates the APA in every conceivable way and is therefore invalid. *See* 5 U.S.C. §§ 706(2)(A)-(D).

243.     Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of Government's conduct. The Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request (a) immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-V, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT V – *ULTRA VIRES* ACTION BEYOND CONSTITUTIONAL BOUNDS (RE: THE GOVERNMENT)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

244.     Congress's authority is "limited to those powers enumerated in the Constitution." The Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549 (1995); see also Const. art. I, § 8.

245.     Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See* James Wilson, State House Yard Speech (Oct. 6, 1787).

246.     Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution").

247.     The Government's censorship scheme violates Plaintiffs' First Amendment rights as detailed above.

248.     Therefore, even if (contrary to what is alleged above) the Government's censorship scheme were within the bounds of the statutory authority delegated by Congress – it is not – the Government's conduct would, and does, remain ultra vires in violation of any conceivable constitutional authority.

249.     For these reasons, the Government proceeded without any authority, much less delegated authority (which, in fact, Congress could never grant them), so their action is ultra vires and must be declared invalid and enjoined.

250.     Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government's conduct. Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request (a) immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-V, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## PRAYER FOR INJUNCTIVE RELIEF (COUNTS I-V)

251.     Plaintiffs, Webseed, Inc. and Brighteon Media, request immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct featured in Counts I-V above, by way of injunctive order inclusive of the following declarations and / or enjoinders:

(A)     Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises constitutes ultra vires action lacking statutory authority and exceeding constitutional authority;

(B)     Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates Plaintiffs' rights to freedom of the press and freedom of speech under the First Amendment of the Constitution;

(C)      Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates the Appropriations Laws of the United States, specifically the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1342 and 1517 and the laws respecting misappropriation of public money, 18 U.S.C. § 641;

(D)      Government's conduct violates the Administrative Procedure Act and accordingly is unlawful and invalid;

(E)      Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, see Fed. R. Civ. P. 65(d)(2)) from further engaging in the unlawful conduct as alleged herein; and

(F)      Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, see Fed. R. Civ. P. 65(d)(2)), from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans.

### COUNT VI – VIOLATION OF TEXAS UNFAIR COMPETITION / ANTITRUST STATUTES (TEXAS FREE ENTERPRISE AND ANTITRUST ACT OF 1983) (RE: NEWSGUARD TECH, ISD, GDI, FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

252.     The Texas Free Enterprise and Antitrust Act of 1983 is codified within Sections 15.01-15.52 of the Texas Statutes.

253.     Section 15.04 provides as follows:

The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose.

*Id.*

254.     Section 15.05 provides, in pertinent part, as follows:

(a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.

(b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.

(c) It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods, whether patented or unpatented, for use, consumption, or resale or to fix a price for such use, consumption, or resale or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce.

(d) It is unlawful for any person to acquire, directly or indirectly, the whole or any part of the stock or other share capital or the assets of any other person or persons, where the effect of such acquisition may be to lessen competition substantially in any line of trade or commerce.

*Id.*

255.     Section 15.21(a)(1) provides as follows:

Any person or governmental entity, including the State of Texas and any of its political subdivisions or tax-supported institutions, whose business or property has been injured by reason of any conduct declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of this Act may sue any person, other than a municipal corporation, in district court in any county of this state in which any of the named defendants resides, does business, or maintains its principal office or in any county

in which any of the named plaintiffs resided at the time the cause of action or any part thereof arose and shall recover actual damages sustained, interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment (the rate of such interest to be in accordance with Texas law regarding postjudgment interest rates and the amount of interest to be adjusted by the court if it finds that the award of all or part of such interest is unjust in the circumstances), and the cost of suit, including a reasonable attorney's fee;  provided, however, that if the trier of fact finds that the unlawful conduct was willful or flagrant, it shall increase the recovery to threefold the damages sustained and the cost of suit, including a reasonable attorney's fee;  provided that interest on actual damages as specified above may not be recovered when recovered damages are increased threefold.

*Id.*

256.    Section 15.21(b) provides as follows:

Any person or governmental entity, including the State of Texas and any of its political subdivisions or tax-supported institutions, whose business or property is threatened with injury by reason of anything declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of this Act may sue any person, other than a municipal corporation, in district court in any county of this state in which any of the named defendants resides, does business, or maintains its principal office or in any county in which any of the named plaintiffs resided at the time the cause of action or any part thereof arose to enjoin the unlawful practice temporarily or permanently. In any such suit, the court shall apply the same principles as those generally applied by courts of equity in suits for injunctive relief against threatened conduct that would cause injury to business or property. In any such suit in which the plaintiff substantially prevails on the merits, the plaintiff shall be entitled to recover the cost of suit, including a reasonable attorney's fee based on the fair market value of the attorney services used.

*Id.*[86]

257.    Section 15.26 provides, in pertinent part, as follows:

Whenever any suit or petition is filed in the district court in any county in the State of Texas as provided for in Section 15.10, 15.20, 15.21, or 15.22 of this Act, the court shall have jurisdiction and venue to hear and determine the matter presented and to enter any order or orders required to implement the provisions of this Act.

*Id.*

---

[86] Per Section 15.21(c), a copy of the complaint was provided to the Texas Attorney General so that the Texas AG could gauge the prospect of participating in this matter; *i.e.*, intervening.

258.    At minimum, Defendants' conduct violates Section 15.05(a) and 15.05(b) and runs afoul of Section 15.04.

259.    As outlined above, Defendants' (NewsGuard Tech, ISD, GDI, Facebook, Google, Twitter; *i.e.*, the Tools and the Instruments) mission was / is to conspire to stunt the economic competition that was / is Plaintiffs, contrary to Section 15.04 which explicitly states "[t]he purpose of this Act is to maintain and promote economic competition in trade and commerce … ."

260.    As outlined above, Tools and Instruments conspired / combined to "restrain[ ] trade or commerce" in relation to Plaintiffs and in violation of Section 15.05(a).

261.    As outlined above, Tools and Instruments conspired / combined "to monopolize, attempt to monopolize … part of trade or commerce" in relation to Plaintiffs in violation of Section 15.05(b).

262.    Defendants' violations of Section 15.05 allow for this civil suit seeking actual damages (*see* Section 15.21(a)) and injunctive relief (*see* Section 15.21(b)).

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, NewsGuard Tech, ISD, GDI, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT VII – VIOLATION OF TEXAS DISCOURSE ON SOCIAL MEDIA PLATFORMS STATUTE (RE: NEWSGUARD TECH, ISD, GDI, FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

263.     The Discourse on Social Media Platforms statute is codified within Sections 143A.001-143A.008 of the Texas Statutes.

264.     Section 143A.002 provides, in pertinent part, as follows:

(a) a social media platform *may not censor a user*, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression or another person's expression; or (3) a user's geographic location in this state or any part of this state.

*Id.* (emphasis added).

265.     Per Section 143A.001(1), "'Censor' means to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." *Id.*

266.     This prohibition of censorship also applies to "a user who . . . (2) does business in this state; or (3) shares or receives expression in this state." § 143A.004(a)(2).

267.     Section 143A.007 provides that:

(a) a user may bring an action against a social media platform that violates this chapter with respect to the user. (b) If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover: (1) declaratory relief under Chapter 37, including cost and reasonable and necessary attorney's fees under Section 37.009; and (2) injunctive relief.

*Id.*

268.     And Section 143A.002(c) allows the court to hold Defendants in contempt if Defendants account(s) access is not reinstated and provides for "daily penalties" to secure compliance. *See id.*

269.     Moreover, the Discourse on Social Media Platforms statute contemplates fee / cost shifting.

270.     Section 143A.007 provides as follows:

(a)  A user may bring an action against a social media platform that violates this chapter with respect to the user.

(b)  If the user proves that the social media platform violated this chapter with respect to the user, the user is entitled to recover: (1) declaratory relief under Chapter 37, including costs and reasonable and necessary attorney's fees under Section 37.009; and (2) injunctive relief.

(c)  If a social media platform fails to promptly comply with a court order in an action brought under this section, the court shall hold the social media platform in contempt and shall use all lawful measures to secure immediate compliance with the order, including daily penalties sufficient to secure immediate compliance.

(d)  A user may bring an action under this section regardless of whether another court has enjoined the attorney general from enforcing this chapter or declared any provision of this chapter unconstitutional unless that court decision is binding on the court in which the action is brought.

(e)  Nonmutual issue preclusion and nonmutual claim preclusion are not defenses to an action brought under this section.

*Id.*

271.     Here, the censorship alleged above against the Tools and Instruments is plain to see. And Section 143A.002 expressly states that the censorship carried out here by the Tools and Instruments is forbidden.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, NewsGuard Tech, ISD, GDI, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT VIII – NEGLIGENCE (RE: NEWSGUARD TECH, ISD, GDI, FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

272.    In Texas, the elements of a negligence cause of action are as follows: (a) duty owed by defendant to plaintiff; (b) breach of that duty; (3) proximate cause of the plaintiff's damages by defendant's breach; and (4) damages.

273.    The Defendants implicated by this Count owed Plaintiffs a general duty to act reasonably.

274.    The "blacklists" flowing from the Tools and the Instruments-effectuated censorship relating to the Tools character "data" were the antithesis of reasonable; *i.e.*, the Defendants implicated by this Court breached their general duty to act reasonably with respect to Plaintiffs.

275.    As to the proximate causation chain, the chain links closest to the harms suffered by Plaintiff are the Tools (as to generating bogus ratings concerning Plaintiffs) and the Instruments (as to carrying out censorship on Social Media platforms). But for the unreasonable character "data" manufactured by the Tools and / or but for the Instruments' censorship predicated on such Tools-generated information, Plaintiffs would not have suffered the damages articulated in, for example, ¶¶ 18-19, 21, *supra*.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, NewsGuard Tech, ISD, GDI, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated

awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT IX – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS / PROSPECTIVE ECONOMIC ADVANTAGE (RE: NEWSGUARD TECH, ISD, GDI, FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

276.    In Texas, to prevail on a claim for tortious interference with a prospective business relationship / economic advantage, the plaintiff must establish that the defendant intentionally prevented the formation of the business relationship or the development of the economic advantage. In Texas, the elements of tortious interference with a prospective business relationship / economic advantage cause of action are as follows: (a) a reasonable probability that the plaintiff would have entered into a business relationship; (b) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (c) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (d) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

277.    First, the Defendants implicated by this Count were certainly intentional / conscious in their desire to destroy Plaintiffs' economic advantage; *i.e.* in their effort to destroy Plaintiffs' businesses.

278.    Second, a simple review of Plaintiffs' historical reach and historical finances demonstrates that only growth laid ahead for Plaintiffs. There was / is most certainly a reasonable probability the Plaintiffs would have entered into additional relationships but for Defendants' interference.

279.    Third, as for the Defendants implicated by this Count having engaged in an independently tortious or unlawful act that prevented the relationship from occurring, there are plenty of independent wrongs that led to the loss of business relations. There are independent torts that Defendants committed in meddling with Plaintiffs' growth potential; *e.g.*, negligence. There is also independent unlawful misconduct by Defendants; *e.g.*, abridgement of Plaintiffs' first amendment rights, contravention of Texas statute, *et cetera*.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, NewsGuard Tech, ISD, GDI, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT X – NEGLIGENT MISREPRESENTATION (RE: FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

280.    In Texas, the elements of a negligent misrepresentation cause of action are as follows: (a) the defendant made a representation in the course of its business, or in a transaction in which it had a pecuniary interest; (b) the defendant supplied false information for the guidance of others in their business; (c) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (d) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

281.    In Texas, a negligent misrepresentation cause of action implicates only the duty of care in supplying commercial information; honesty or good faith is no defense.

85

282.     Here, Facebook, Google, and Twitter affirmatively represented that their Internet Computer Services are free to all, open to all, and utilizable by all. Moreover, Facebook, Google, and Twitter certainly had a pecuniary interest in representations made to Plaintiffs.

283.     These representations, callously made by Facebook, Google, and Twitter, were plainly false. Moreover, these representations were plainly made by Facebook, Google, and Twitter so as to guide the formation of businesses through their Internet Computer Services.

284.     Plaintiffs (along with tens of thousands of others) justifiably relied on Facebook, Google, and Twitter in availing themselves of these Internet Computer Services to form and grow their businesses. When Facebook, Google, and Twitter pulled the ICS rug out from underneath Plaintiffs, Plaintiffs sustained (and continue to sustain) substantial damages (conservatively estimated as greater than $25,000,000.00++).

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT XI – FRAUD (RE: FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

285.     In Texas, the elements of a fraud cause of action are as follows:  (a) a material representation was made; (b) the representation was false; (c) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a

positive assertion; (d) the representation was made with the intention that it be acted upon by the other party; (e) the party acted in reliance upon the representation;  and (f) the party suffered damages.

286.    Here, Facebook, Google, and Twitter affirmatively represented that their Internet Computer Services are free to all, open to all, and utilizable by all. And Facebook, Google, and Twitter fully intended for Plaintiffs to act upon these falsehoods.

287.    Facebook, Google, and Twitter certainly had a pecuniary interest underlying the falsehoods put forth to Plaintiffs.

288.    These representations, callously made by Facebook, Google, and Twitter, were plainly false. Moreover, these representations were plainly made by Facebook, Google, and Twitter so as to guide the formation of businesses through their Internet Computer Services.

289.    Plaintiffs (along with tens of thousands of others) justifiably relied on Facebook, Google, and Twitter in availing themselves of these Internet Computer Services to form and grow their businesses. When Facebook, Google, and Twitter pulled the ICS rug out from underneath Plaintiffs, Plaintiffs sustained (and continue to sustain) substantial damages (conservatively estimated as greater than $25,000,000.00++).

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT XII– PROMISSORY ESTOPPEL (RE: FACEBOOK, GOOGLE, AND TWITTER)

Plaintiffs re-allege Paragraphs 1 through 209 as if fully set forth herein, and further allege as follows.

290.    In Texas, the elements of a promissory estoppel cause of action are as follows: (a) a promise; (b) reliance thereon that was foreseeable to the promisor; and (c) substantial reliance by the promise to his detriment.

291.    Here, Facebook, Google, and Twitter promised their Internet Computer Services to users (like Plaintiffs) were free, open to all, and utilizable by all.

292.    It is undeniable that Facebook, Google, and Twitter intended for the promisee (here, Plaintiffs) to rely on promises made; *i.e.*, Facebook, Google, and Twitter cannot somehow legitimately say that they did not foresee other users' reliance on their promises.

293.    A huge portion of Plaintiffs' businesses revolves around Internet Computer Services, in particularly Facebook, Google, and Twitter; thus, Plaintiffs' reliance on the promises of Facebook, Google, and Twitter cannot be classified as anything other than "substantial."

294.    And the damages sustained by Plaintiffs in relation to Facebook's, Google's, and Twitter's pulling the ICS rug out from underneath Plaintiffs notwithstanding promises to the contrary are "substantial" (presently conservatively estimated at $25,000,000.00++).

295.    In the end, it is evident that Facebook's, Google's, and Twitter's promises were lies and that they knew that their promises were false / hollow promises all along.

WHEREFORE, Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $25,000,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on

these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## JURY DEMAND

296.     Plaintiffs, Webseed, Inc. and Brighteon Media, Inc., demand a trial by jury on all issues so triable as a matter of right.

Dated:  May 27, 2024.

Respectfully Submitted,

**GREYBER LAW, PLLC**

*/s/* Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Texas Bar No. 24103030
9170 Glades Rd., #161
Boca Raton, Florida  33434
(561) 702-7673
(833) 809-0137 (f)
jgreyber@greyberlaw.com
*Attorney for Plaintiffs*

*and*

**POLI, MOON & ZANE, PLLC**

**Jeffrey G. Zane, Esq.**
Texas Bar No. 24095197
807 S. Rock St., Ste. 101
Georgetown, TX 78626
(512) 508-4693
(602) 857-7333 (f)
jzane@pmzlaw.com
*Attorney for Plaintiffs*